VALU ENGINEERING,
INC., Appellant,

v.

REXNORD CORPORATION,
Cross–Appellant.

Nos. 00–1565, 00–1566.

United States Court of Appeals,
Federal Circuit.

Jan. 23, 2002.

Darrell L. Olson, Knobbe, Martens, Olson & Bear, LLP, of Newport Beach, California, argued for appellant. With him on the brief was Steven J. Nataupsky.

David R. Cross, Quarles & Brady LLP, of Milwaukee, Wisconsin, argued for cross-appellant. With him on the brief was Jennifer A. Lazewski.

Before NEWMAN, BRYSON, and DYK, Circuit Judges.

## DECISION

DYK, Circuit Judge.

Valu Engineering, Inc. ("Valu") appeals a decision of the Trademark Trial and Appeal Board ("Board") sustaining Rexnord Corporation's ("Rexnord") opposition to registration of Valu's cross-sectional designs of conveyor guide rails as trademarks on the Principal Register. *Rexnord Corp. v. Valu Eng'g, Inc.*, No. 94,922, slip op. (TTAB May 9, 2000). Rexnord cross-appeals the Board's denial of Rexnord's claims that registration should be denied because of Valu's alleged inequitable conduct. Because the Board correctly concluded that Valu's cross-sectional designs of conveyor guide rails are *de jure* functional, we *affirm* the Board's refusal to register Valu's designs and *dismiss* Rexnord's cross-appeal as moot.

## BACKGROUND

On February 25, 1993, Valu filed three applications seeking registration of conveyor guide rail configurations in ROUND, FLAT, and TEE cross-sectional designs as trademarks on the Principal Register. Conveyor guide rails are rails positioned along the length of the sides of a conveyor to keep containers or objects that are traveling on the conveyor from falling off the conveyor. Valu's ROUND, FLAT, and TEE cross-sectional designs are shown below.

 

For each cross-sectional design, Valu asserted a claim of acquired distinctiveness under 15 U.S.C. § 1052(f). In each application, Valu specified the goods[1] in con-

---

**1.** When applying for federal registration, an applicant must specify "the goods in connec-

nection with which Valu uses the marks in commerce as "Conveyor Guide Rails." The Examining Attorney approved the applications. Rexnord timely filed Opposition Nos. 94,922, 94,937, and 94,946, which the Board consolidated.

Rexnord alleged that all three guide rail designs were *de jure* functional and thus unregistrable; that the applied-for marks were invalid because Valu was a licensee and not the owner of the designs at the time the applications were filed; and that the applied-for marks were invalid because Valu engaged in inequitable conduct before the Examining Attorney. The focus of the opposition as concerns functionality was on the "wet" areas of bottling and canning plants. Such areas are considered "wet" because the machinery, including conveyor guide rails, is frequently washed with disinfectants containing bactericides, such as chlorine, for sanitation and product spillage. Because these washing solutions are corrosive, the machinery in the wet areas are usually formed of noncorrosive materials, such as stainless steel and plastic.

The Board concluded that Valu's cross-sectional shapes were functional and not registrable, and sustained Rexnord's opposition on May 9, 2000. *Rexnord*, slip op. at 63–64. The Board analyzed the functionality of Valu's guide rail configurations by applying the factors outlined by this court's predecessor in *In re Morton–Norwich Products, Inc.*, 671 F.2d 1332, 1340–41, 213 USPQ 9, 15–16 (CCPA 1982). The Board focused its functionality analysis on the utilitarian advantages of Valu's guide rail configurations as they are used in a particular application, *i.e.*, the so-called "wet areas" of bottling and canning plants,

and as they are composed of particular materials, *i.e.*, stainless steel and plastic. The Board determined that all four *Morton–Norwich* factors weighed in favor of a finding of functionality. Specifically, the Board found that: an abandoned utility patent application filed by Valu but rejected under 35 U.S.C. § 103 "disclose[d] certain utilitarian advantages of [Valu's] guide rail designs, and that those advantages ... result from the shape of the guide rail designs," *Rexnord*, slip op. at 12; Valu's advertising materials "tout the utilitarian advantages of [Valu's] guide rail design[s]," *id.* at 23; the "limited number of basic guide rail designs ... should not be counted as 'alternative designs'" because they are "dictated solely by function," *id.* at 30; and Valu's guide rail designs "result[ ] in a comparatively simple or cheap method of manufacturing," *id.* at 41. Accordingly, the Board sustained Rexnord's opposition and refused to register Valu's guide rail designs.

The Board denied Rexnord's inequitable conduct claims, concluding that Rexnord failed to prove that Valu's statement that it never applied for a utility patent was fraudulent, *id.* at 46–47, or material to the examination of Valu's application, *id.* at 48, that Rexnord failed to prove by clear and convincing evidence that Valu committed fraud by failing to disclose a trade journal article, *id.* at 52, and that Rexnord failed to prove by clear and convincing evidence that Valu's president's claim of ownership of the applied-for marks was fraudulent, *id.* at 56. This timely appeal followed.

The primary issue on appeal is whether the Board erred in confining its functional-

tion with which the mark is used" or "with which the applicant has a bona fide intent[ ] to use" the mark in commerce. 15 U.S.C. §§ 1051(a)(2) and 1051(b)(2) (2000). The application "must specify the 'particular' goods or services on or in connection with which

the applicant uses, or has a bona fide intention to use, the mark, ... using terminology which is generally understood." Trademark Manual of Examining Procedure, § 804.01 (2d ed., Rev.1.1, 1997).

ity analysis to a particular use, rather than considering all potential uses for the marks. In light of our disposition of this case, we do not address Rexnord's cross-appeal concerning the Board's rejection of its inequitable conduct claims.

## DISCUSSION

### I

#### *Jurisdiction and Standard of Review*

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(4)(B) and 15 U.S.C. § 1071(a).

■■ Functionality is a question of fact, *Morton–Norwich*, 671 F.2d at 1340, 213 USPQ at 15, and depends on the totality of the evidence, *In re Owens–Corning Fiberglas Corp.*, 774 F.2d 1116, 1120, 227 USPQ 417, 419 (Fed.Cir.1985). We uphold the Board's factual findings unless they are unsupported by substantial evidence. *Dickinson v. Zurko*, 527 U.S. 150, 165, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999); *In re Gartside*, 203 F.3d 1305, 1315, 53 USPQ2d 1769, 1775 (Fed.Cir.2000); *Recot, Inc. v. M.C. Becton*, 214 F.3d 1322, 1327, 54 USPQ2d 1894, 1897 (Fed.Cir.2000) (holding that Board findings of fact are reviewed under the "substantial evidence" standard). Legal issues are reviewed without deference. *Action Temp. Servs., Inc. v. Labor Force, Inc.*, 870 F.2d 1563, 1566, 10 USPQ2d 1307, 1310 (Fed.Cir. 1989).

### II

#### *Functionality*

■■ Beginning at least with the decisions in *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 119–120, 59 S.Ct. 109, 83 L.Ed. 73 (1938), and *Morton–Norwich*, 671 F.2d at 1336–37, 213 USPQ at 11–12, the Supreme Court and this court's predecessor have held that a mark is not registra-

ble if the design described is functional, because "patent law, not trade dress law, is the principal means for providing exclusive rights in useful product features." *Elmer v. ICC Fabricating*, 67 F.3d 1571, 1580, 36 USPQ2d 1417, 1423 (Fed.Cir. 1995). The First Circuit likewise has noted that "[t]rademark and trade dress law cannot be used to evade the requirements of utility patents, nor the limits on monopolies imposed by the Patent Clause of the Constitution." *I.P. Lund Trading ApS v. Kohler*, 163 F.3d 27, 38, 49 USPQ2d 1225, 1232 (1st Cir.1998). Commentators share this view: "trademark law cannot properly make an 'end run' around the strict requirements of utility patent law by giving equivalent rights to exclude." J. Thomas McCarthy, *1 McCarthy on Trademarks and Unfair Competition* § 7:64, 7–147 (4th ed.2001).

■■ The functionality doctrine thus accommodates trademark law to the policies of patent law:

The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, 35 U.S.C. §§ 154,173, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

*Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995).

 Our decisions distinguish *de facto* functional features, which may be entitled to trademark protection, from *de jure* functional features, which are not. "In essence, *de facto* functional means that the design of a product has a function, *i.e.,* a bottle of any design holds fluid." *In re R.M. Smith, Inc.,* 734 F.2d 1482, 1484, 222 USPQ 1, 3 (Fed.Cir.1984). *De facto* functionality does not necessarily defeat registrability. *Morton–Norwich,* 671 F.2d at 1337, 213 USPQ at 13 (A design that is *de facto* functional, *i.e.,* " 'functional' in the lay sense ... *may* be legally recognized as an indication of source."). *De jure* functionality means that the product has a particular shape "because it works better in this shape." *Smith,* 734 F.2d at 1484, 222 USPQ at 3.

Congress explicitly recognized the functionality doctrine in a 1998 amendment to the Lanham Act by making "functionality" a ground for *ex parte* rejection of a mark.[2] 15 U.S.C. § 1052(e)(5) (2000). Under this provision, a mark that comprises "*any matter* that, as a whole, is functional" is not entitled to trademark protection. *Id.* (emphasis added). Although the new statutory basis for refusal of registration does not apply in this case,[3] we note that the 1998 amendment was intended to "make explicit some of the current practices of the Patent and Trademark Office with respect to the trademark protection of matter that is wholly functional," and referred to the amendment as a "mostly technical," "housekeeping" amendment. *See* 105 Cong. Rec. S6572 (daily ed. June 18, 1998) (statement of Sen. Hatch).

### III

*Definition of "functionality"*

 To determine whether a particular product design is *de jure* functional, we have applied the "*Morton–Norwich* factors": (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product. *Morton–Norwich,* 671 F.2d at 1340–41, 213 USPQ at 15–16.

 Because we have an obligation to apply the case law in effect at the time of decision, *Harper v. Va. Dep't of Taxation,* 509 U.S. 86, 96, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), we must determine whether the Supreme Court's recent decision in *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) altered the *Morton–Norwich* factors. In order to understand the Supreme Court's decision in *TrafFix,* it is important to understand the background of *TrafFix* and the decisions on which the Court relied, namely *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982), and *Qualitex Co. v.*

---

**2.** "No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it: ... (e) Consists of a mark which ... (5) comprises any matter that, as a whole, is functional." 15 U.S.C. § 1052(e)(5) (2000).

**3.** The statute applies only to applications filed after October 30, 1998. Technical Corrections to Trademark Act of 1946, Pub.L. No. 105–330, § 201(b), 112 Stat. 3064 (1998). The application in this case was filed on February 25, 1993.

*Jacobson Products Co.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995).

*Inwood* involved the standards for appellate review of district court findings under § 32 of the Lanham Act, codified at 15 U.S.C. § 1114(1) (2000), relating to the misuse of another's trademark in connection with the sale or advertisement of goods where such use is likely to cause confusion or deception. Although the issue of functionality was not directly before the Court, the Court noted, in describing the proceedings below where functionality had been at issue, that "[i]n general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." 456 U.S. at 850 n. 10, 102 S.Ct. 2182. This statement was later characterized as the "traditional rule" of functionality. *TrafFix,* 121 S.Ct. at 1261–62.

Thereafter, in *Qualitex,* the issue was whether color alone can qualify for trademark protection. Qualitex sued Jacobsen for infringement of its trademark in the green-gold color of its dry cleaning press pads. The Supreme Court held that color is subject to trademark protection and that Qualitex presented sufficient evidence to establish that the green-gold color had acquired secondary meaning and was not functional. *Qualitex,* 514 U.S. at 167, 115 S.Ct. 1300. Discussing the functionality doctrine, the Supreme Court expanded upon the "traditional rule" of *Inwood,* and re-characterized that rule: " 'a product feature is functional ... if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputational-related disadvantage." *Id.* at 165, 115 S.Ct. 1300.

Most recently in *TrafFix,* MDI, a manufacturer of traffic sign stands, sued Traf-Fix for infringing MDI's trade dress in a dual-spring feature that keeps temporary traffic signs upright in adverse wind conditions. The district court found the dual-spring design functional because the design was claimed in two MDI expired utility patents, MDI touted the utilitarian advantages of the design in advertisements, and the design affected the cost and quality of the traffic signs. *Marketing Displays, Inc. v. TrafFix Devices, Inc.,* 971 F.Supp. 262 (E.D.Mich.1997). The court of appeals held that the district court erred in finding that the dual-spring design was functional. *Marketing Displays, Inc. v. TrafFix Devices, Inc.,* 200 F.3d 929, 942 (6th Cir.1999). The court of appeals criticized the district court for finding functionality where granting MDI exclusive use of the design would only hinder competition "somewhat," *id.* at 940, stating: "[t]he appropriate question is whether the particular product configuration is a competitive necessity," and that "[h]aving any effect on cost or quality is not enough. Exclusive use of a feature must 'put competitors at a *significant* non-reputation-related disadvantage' before trade dress protection is denied on functionality grounds." *Id.* at 940 (quoting *Qualitex,* 514 U .S. at 165, 115 S.Ct. 1300).

The Supreme Court reversed, finding that the court of appeals gave insufficient evidentiary weight to the expired utility patents in analyzing the functionality of the dual-spring design, and that it over-read *Qualitex:* "the Court of Appeals ... seemed to interpret [*Qualitex* ] to mean that a necessary test for functionality is 'whether the particular product configuration is a competitive necessity.' ... This was incorrect as a comprehensive definition." *TrafFix,* 121 S.Ct. at 1261. The Court then reaffirmed the "traditional rule" of *Inwood* that "a product feature is functional if it is essential to the use or purpose of the article or if it affects the

cost or quality of the article." *Id.* The Court further held that once a product feature is found to be functional under this "traditional rule," "there is no need to proceed further to consider if there is competitive necessity for the feature," and consequently "[t]here is no need ... to engage ... in speculation about other design possibilities.... Other designs need not be attempted." *Id.* at 1262.[4]

 We do not understand the Supreme Court's decision in *TrafFix* to have altered the *Morton–Norwich* analysis. As noted above, the *Morton–Norwich* factors aid in the determination of whether a particular feature is functional, and the third factor focuses on the availability of "other alternatives." *Morton–Norwich,* 671 F.2d at 1341. We did not in the past under the third factor require that the opposing party establish that there was a "competitive necessity" for the product feature. Nothing in *TrafFix* suggests that consideration of alternative designs is not properly part of the overall mix, and we do not read the Court's observations in *TrafFix* as rendering the availability of alternative designs irrelevant. Rather, we conclude that the Court merely noted that once a product feature is found functional based on other considerations[5] there is no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available. But that does not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place. We find it significant that neither party argues that *TrafFix* changed the law of functionality, and that scholarly commentary has reached exactly the same conclusion that we have:

> In the author's view, the observations by the Supreme Court in *TrafFix* do not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine in the first instance if a particular feature is in fact "functional." Rather, the Court merely said that once a design is found to be functional, it cannot be given trade dress status merely because there are alternative designs available....
>
> ....
>
> ... The existence of actual or potential alternative designs that work equally well strongly suggests that the particular design used by plaintiff is not needed by competitors to effectively compete on the merits.

J. Thomas McCarthy, *1 McCarthy on Trademarks and Unfair Competition,* § 7:75, 7–180–1 (4th ed.2001). In sum, *TrafFix* does not render the Board's use of the *Morton–Norwich* factors erroneous.

## IV

### Analysis Confined to a Single Application

 The central question here is whether the Board improperly focused on

---

**4.** *TrafFix* suggests that there may be a requirement under *Qualitex* to inquire into a "significant non-reputation-related disadvantage" in aesthetic functionality cases, because aesthetic functionality was "the question involved in *Qualitex.*" 121 S.Ct. at 1262. This statement has been criticized because "aesthetic functionality was *not* the central question in the *Qualitex* case." J. Thomas McCarthy, *1 McCarthy on Trademarks and Unfair Competition* § 7:80, 7–198 (4th ed.2001). We need

not decide what role, if any, the determination of a "significant non-reputation-related disadvantage" plays in aesthetic functionality cases, because aesthetic functionality is not at issue here.

**5.** For example, a feature may be found functional where the feature "affects the cost or quality of the device." *TrafFix,* 121 S.Ct. at 1263.

a single application. Here, in its analysis of the four *Morton–Norwich* factors, the Board focused primarily on the utilitarian advantages of Valu's designs in a particular, competitively-significant application, namely, as they are used in the wet areas of bottling and canning plants. Rather than considering all potential uses of the marks, the Board confined its analysis to this particular application, reasoning that "[a] finding of *de jure* functionality does not depend on a finding that applicant's design is *de jure* functional as applied to all possible industries and applications which might be encompassed by the identification of goods." Valu contends on appeal that the Board erred in confining its functionality analysis to a single use, arguing that the Board should have instead considered all possible and potential uses of the marks.

Valu also contends that the Board improperly confined its functionality analysis to Valu guide rails composed of specific materials, *i.e.*, stainless steel and plastic. The Board focused on these materials because it found that these are the only materials suitable for use in the wet areas of bottling and canning plants. Therefore, Valu's contention that the Board erred by focusing on particular materials is essentially the same as its contention that the Board erred by focusing on a particular application. Accordingly, both contentions collapse into a single issue: whether the Board erred in confining its functionality analysis to the wet areas of bottling and canning plants. This issue is apparently (and surprisingly) an issue of first impression both in this court and before the Board. We conclude that the Board properly limited itself to a single application.

■ An important policy underlying the functionality doctrine is the preservation of competition. As this court's predecessor noted in *Morton–Norwich*, the "effect upon competition 'is really the crux' " of the functionality inquiry, *id.* at 1341, 671 F.2d 1332, 213 USPQ at 16, and, accordingly, the functionality doctrine preserves competition by ensuring competitors "the right to compete effectively." *Id.* at 1339. As we stated in *Brunswick Corp. v.. British Seagull Ltd.*, 35 F.3d 1527, 1531, 32 USPQ2d 1120, 1122 (Fed.Cir. 1994), "functionality rests on 'utility,' which is determined in light of 'superiority of design,' and rests upon the foundation of 'effective competition.' " The importance of competition was reaffirmed in *Qualitex*, in which the Supreme Court focused on whether a feature "would put competitors at a significant non-reputation-related disadvantage." *Qualitex*, 514 U.S. at 165, 115 S.Ct. 1300. And when discussing the policy behind limiting trade dress protection, the Supreme Court in *TrafFix* noted that "[a]llowing competitors to copy will have salutary effects in many instances." *TrafFix*, 121 S.Ct. at 1260.

■ Thus, in determining "functionality," the Board must assess the effect registration of a mark would have on competition. Although in examining likelihood of confusion, registrability "must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods," *Octocom Sys., Inc. v. Houston Computer Servs., Inc.*, 918 F.2d 937, 942, 16 USPQ2d 1783, 1788 (Fed.Cir.1990), for functionality purposes a narrower inquiry is appropriate. Requiring the Board to review the "entire universe" of potential uses of a contested mark in the recited identification of goods would seriously undermine the goals of the functionality doctrine. Functionality may be established by a single competitively significant application in the recited identification of goods, even if there is no anticompetitive effect in

any other areas of use, since competitors in that single area could be adversely affected.

Such an approach is also supported by other considerations. A targeted Board analysis focusing on a single use deters applicants from claiming an overbroad identification of goods in order to defeat a functionality finding, and makes possible more efficient Board proceedings by eliminating the need to address each and every possible use of the challenged mark.

The statutory language of the newly enacted statute supports this result as well. Section 2(e)(5) prohibits registration of a mark that "comprises *any matter* that, as a whole, is functional."[6] 15 U.S.C. § 1052(e)(5) (2000) (emphasis added). This suggests that if the Board identifies *any* competitively significant single use in the recited identification of goods for which the mark as a whole is functional, the Board should deny registration.

Substantial evidence supports the conclusion that the wet areas of bottling and canning plants are competitively significant. Valu urges that the Board made no findings on competitive significance of the wet areas of bottling and canning plants, and that the record is devoid of evidence on the subject. Instead, Valu steadfastly maintains that the "record says nothing" about the competitive significance of the wet areas of bottling and canning plants, and that "[t]he record is silent as to what,

if any, competitive significance the 'wet areas' have." We agree that the Board made no findings on the issue, no doubt because Valu did not even raise the issue of significance below. But in fact Rexnord submitted substantial evidence showing that the wet areas of bottling and canning plants comprise a significant segment of the market for Rexnord's and Valu's guide rails. A Rexnord executive testified that the single biggest end users of Rexnord guide rail products are bottling and canning plants. The record shows that bottling, canning, and other plants that require sanitary filling of containers have wet areas, and that wet areas are a substantial portion of those conveyor lines. Valu's president testified that Valu's major customers include manufacturers that have "wet areas" in a substantial portion of their conveyor lines, where containers are filled with such products as food, beverages, shampoo, and cosmetics.[7] A Rexnord expert testified that bottling and canning plant "wet areas" constitute a substantial portion of the conveyor lines, including the areas where the containers are filled, sealed, labeled, pasteurized, warmed, and cooled, and where the containers undergo the processes necessary for final packaging. Valu has not called our attention to any contrary evidence.

Even if the record failed to conclusively establish the competitive significance of that particular application, Rexnord made a *prima facie* showing that

---

6. The term "as a whole" existed under prior decisional law and refers to the entirety of the mark itself, rather than the entirety of the class of goods in connection with which the mark is used. *In re Teledyne Indus., Inc.*, 696 F.2d 968, 971, 217 U.S.P.Q. 9 (Fed.Cir.1982) (noting that functionality of a mark is properly determined by considering the mark as a whole, rather than dissecting the mark into its design features).

7. Valu's president testified that Valu customers include major manufacturers such as Anheuser Busch, Pepsi Cola, Heinz, and Campbell's, that fill containers with food and beverages, and major healthcare and cosmetics manufacturers, such as Proctor & Gamble, Lever Brothers, ELF, and Baxter Travenol, that fill plastic and paper containers with substances such as shampoo, toothpaste and shaving cream, and that "wet areas" include container-filling sections of such conveyor lines.

Valu's designs are functional as used in the wet areas of bottling and canning plants, and that the wet areas of bottling and canning plants are a competitively-significant application. Where, as here, the opposer in a trademark opposition has made a *prima facie* showing of functionality, the burden shifts to the applicant to prove nonfunctionality. *Textron, Inc. v. U.S. Int'l Trade Comm'n,* 753 F.2d 1019, 1025, 224 USPQ 625, 629 (Fed.Cir.1985) ("[A]n applicant for trademark protection has the burden to prove that the design is nonfunctional, once a *prima facie* case of functionality is made by the opponent."); *Teledyne,* 696 F.2d at 971, 217 USPQ at 11 (finding that applicant failed to rebut the examiner's prima facie case of functionality); *Goodyear Tire & Rubber Co. v. Interco Tire Corp.,* 49 USPQ2d 1705, 1717–18 (TTAB 1998) ("Opposer, of course, has the burden of establishing a *prima facie* case of *de jure* functionality for applicant's ... design in order to shift the burden to applicant of showing that its subject design is not functional.").

 To prevail in a trademark opposition proceeding, the applicant must rebut the opposer's *prima facie* evidence of functionality with competent evidence. *See Smith,* 734 F.2d at 1484, 222 USPQ at 3. The appropriateness of shifting the burden to the applicant in a trademark opposition proceeding is supported by the recent amendment to Section 43(a) of the Lanham Act, which shifts the burden of proving nonfunctionality of unregistered trade dress to the applicant-plaintiff in civil actions for trade dress infringement, even without a *prima facie* showing by the alleged infringer.[8] 15 U.S.C. § 1125(a)(3) (2000).

In this case, Valu failed to refute Rexnord's *prima facie* showing of competitive significance. Thus, we find that the Board did not err in confining its functionality analysis to the wet areas of the plants.

## V

### *Application of Morton–Norwich factors*

 Valu also challenges the Board's application of the *Morton–Norwich* factors. But this challenge is based almost entirely on Valu's contention that the Board improperly confined its functionality analysis to wet areas of the plants, an argument we have rejected. We agree with the Board that an abandoned patent application should be considered under the first *Morton–Norwich* factor, because an applied-for utility patent that never issued has evidentiary significance for the statements and claims made in the patent application concerning the utilitarian advantages, just as an issued patent has evidentiary significance. *See TrafFix.* We find that under the proper standard the Board's findings are supported by substantial evidence.

## CONCLUSION

Because the Board's decision to confine its functionality analysis to a competitively significant application of Valu's guide rail designs was not legally erroneous, and because we find that the Board's finding that Valu's guide rails are *de jure* functional is supported by substantial evidence, the Board's refusal to register Valu's guide rail designs is *affirmed,* and Rexnord's cross-appeal is dismissed as moot.

*AFFIRMED*

---

8. "In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. § 1125(a)(3) (2000).

COSTS

No costs.