THIS OPINION IS CITABLE
AS PRECEDENT OF THE
TTAB

Mailed:
July 5, 2006

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Howard Leight Industries, LLC
_____

Serial No. 76439661
_____

Robert D. Hornbaker of Freilich, Hornbaker, and Rosen for Howard Leight Industries, LLC.

Alain Lapter, Trademark Examining Attorney, Law Office 108 (Andrew Lawrence, Managing Attorney).[1]
_____

Before Grendel, Holtzman and Drost, Administrative Trademark Judges.

Opinion by Grendel, Administrative Trademark Judge:

Applicant seeks registration on the Principal Register

of the matter depicted below



_____

[1] A different Trademark Examining Attorney handled this application prior to appeal.

for goods identified in the application, as amended, as "earplugs for noise protection formed of slow recovery resilient foam material."[2] The application includes the following description of the mark: "The mark consists of a bullet-shaped earplug with a vertical axis, a rounded bottom, and a radially outwardly flared top."

The Trademark Examining Attorney has issued a final refusal of registration on the ground that the matter sought to be registered is functional and thus unregistrable under Trademark Act Section 2(e)(5), 15 U.S.C. §1052(e)(5), and on the alternative ground that if the matter is not functional, it is a configuration of the goods which has not acquired distinctiveness and which thus is not registrable pursuant to Trademark Act Section 2(f), 15 U.S.C. §1052(f).

Applicant has appealed the final refusal. The appeal is fully briefed;[3] no oral hearing was requested. The evidence of record on appeal consists of the following: the application file, including the product packaging submitted

---

[2] Serial No. 76439661, filed August 5, 2002. The application is based on use in commerce under Trademark Act Section 1(a), 15 U.S.C. §1051(a). April 9, 1987 is alleged to be the date of first use and the date of first use in commerce.

[3] Because a premature final refusal was issued and then withdrawn, the operative main brief for applicant in this case is its September 29, 2005 Supplemental Appeal Brief, and the Addendum thereto filed on October 12, 2005.

as applicant's specimens of use; applicant's expired U.S. (Utility) Patent No. 4,774,938, entitled "SLOW RECOVERY EARPLUG WITH LARGELY IMPENETRABLE SURFACE"; a photograph of eight earplugs asserted by applicant to be alternative earplug designs; twenty design patents for earplugs, asserted by applicant to be alternative earplug designs; samples of applicant's advertising and promotional materials; and the Declaration of applicant's vice-president, Mark Hampton.

After careful review of the evidence and the arguments of counsel, and for the reasons discussed below, we affirm the refusal to register on the ground that the matter sought to be registered is functional, and also affirm on the alternative ground that the matter sought to be registered has not acquired distinctiveness.

## Functionality

Trademark Act Section 2(e)(5)[4] precludes registration of "any matter that, as a whole, is functional."[5]  The

---

[4] This provision of the statute applies only to applications filed after October 30, 1998.  Technical Corrections to Trademark Act of 1946, Pub. L. No. 105-330, §201(b), 112 Stat. 3064 (1998). The present application was filed on August 5, 2002.

[5] "The term 'as a whole' existed under prior decisional law and refers to the entirety of the mark itself, rather than the entirety of the class of goods in connection with which the mark

Supreme Court has stated: "In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982). The Supreme Court has called this "*Inwood* formulation" the "traditional rule" of functionality. *TrafFix Devices Inc. v. Marketing Displays Inc.*, 532 U.S. 23, 58 USPQ2d 1001, 1006 (2001).

The functionality doctrine is intended to encourage legitimate competition by maintaining the proper balance between trademark law and patent law. As the Supreme Court observed in *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 34 USPQ2d 1161, 1163-64 (1995):

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks,

---

is used." *Valu Engineering Inc. v. Rexnord Corp.,* 278 F.3d 1268, 61 USPQ2d 1422, at n.6 (Fed. Cir. (2002).

4

however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity). That is to say, the Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity. The Lanham Act, furthermore, does not protect trade dress in a functional design simply because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller.

The Federal Circuit, our primary reviewing court, looks at four factors when it considers the issue of functionality: (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product. *Valu Engineering Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1426 (Fed. Cir. 2002), citing *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 213 USPQ 9, 15-16 (CCPA 1982). These are known as the *Morton-Norwich* factors.

The first *Morton-Norwich* factor is the existence of a utility patent disclosing the utilitarian advantages of the design. For purposes of this factor, we consider not only utility patents which are currently extant, but also expired utility patents. *See TrafFix Devices Inc., supra*, 58 USPQ2d at 1005-1007.[6]

Regarding the evidentiary value of utility patents in the functionality determination, the Supreme Court has instructed as follows:

> A prior patent, we conclude, has vital significance in resolving the trade dress claim. A utility patent is strong evidence that the features therein claimed are functional. If trade dress protection is sought for those features the strong evidence of functionality based on the previous patent adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection. Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental or arbitrary aspect of the device.

---

[6] Abandoned utility patent applications likewise are probative evidence under the first *Morton-Norwich* factor. *See Valu Engineering Inc., supra*, 61 USPQ2d at 1429.

*TrafFix Devices Inc., supra*, 58 USPQ2d at 1005.[7]  The Court

further explained (in reference to the patented road sign

design at issue in *TrafFix*):

> In a case where a manufacturer seeks to protect
> arbitrary, incidental, or ornamental aspects of
> features of a product found in the patent
> claims, such as arbitrary curves in the legs or
> an ornamental pattern painted on the springs, a
> different result might obtain.  There the
> manufacturer could perhaps prove that those
> aspects do not serve a purpose within the terms
> of the utility patent.  [The patent and its
> prosecution history must be examined] to see if
> the feature in question is shown as a useful
> part of the invention.

*TrafFix, supra*, 58 USPQ2d at 1007.[8]  Professor McCarthy

notes in this regard:  "Prior case law cautions that a

---

[7] The "statutory presumption that features are deemed functional
until proved otherwise" to which the Court refers is applied in
trade dress infringement actions brought under Trademark Act
Section 43(a).  *See* Trademark Act Section 43(a)(3), 15 U.S.C.
§1125(a)(3).  In ex parte proceedings before the Board, by
contrast, the Office has the initial burden of establishing a
prima facie case of functionality.  Likewise, the plaintiff in an
inter partes proceeding before the Board bears the initial burden
of establishing a prima facie case of functionality.  If such
prima facie case is established, the burden then shifts to the
applicant (or registrant) to prove nonfunctionality.  *See Valu-
Engineering Inc., supra*, 61 USPQ2d at 1429, and cases cited
therein.  While the Section 43(a)(3) statutory presumption of
functionality is not applicable in Board proceedings, we
understand the Supreme Court's instructions in *TrafFix*, quoted
above, to require us to regard a utility patent as "strong
evidence" entitled to "great weight" in our determination of
whether the Office (or an inter partes plaintiff) has established
a prima facie case of functionality.  If such prima facie case is
supported by the existence of a utility patent claiming the
design feature(s) in question, the burden shifts to the applicant
(or registrant) to prove nonfunctionality.

utility patent must be examined in detail to determine whether the disclosed configuration is really primarily functional or is just a non-functional shape that happens to be described or pictured as an incidental detail in a patent disclosure." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §7:89 (4th ed. 2006). Similarly, as McCarthy notes at §7:89.1, the Court of Customs and Patent Appeals has stated that "[a] patent may not be evidence of functionality in regard to things of a 'purely arbitrary' or 'mere design' nature which happen to be disclosed in the patent but which are not attributed any functional significance therein." *Best Lock Corp. v. Schlage Lock Co.*, 413 F.2d 1195, 162 USPQ 552, 556 (C.C.P.A. 1969).

However, if the patent discloses the functionality of the design,

> ...this evidence is particularly entitled to
> great weight if the patent was applied for by
> the same person who now asserts trademark
> significance in the same configuration. A kind
> of estoppel arises. That is, one cannot argue

---

[8] Professor McCarthy has pointed out that non-functional elements of an invention, such as "arbitrary curves" or a painted "ornamental pattern," should not and do not appear in the claims of a utility patent as asserted by the Supreme Court in the quoted language; "[t]herefore, the Court must have been referring to non-functional features that appear in a patent disclosure." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §7:89 (4th ed. 2006).

> that a shape is functionally advantageous in
> order to obtain a utility patent and later
> assert that the same shape is non-functional in
> order to obtain trademark protection.
> Functional patent protection and trademark
> protection are mutually exclusive.  As one
> court stated, when the configuration is
> disclosed in a functional patent, and the
> patent expires, the public "now has its
> inning."

McCarthy, *supra*, at §7:89.1.

Before we turn to the patent evidence in this case, we must address applicant's argument regarding the evidentiary value to be accorded to the various portions of the patent. Applicant argues (Supplemental Appeal Brief at 12-13) that the Trademark Examining Attorney erred in looking to the claims made in applicant's patent, and implies that we too should not or may not look to those claims in determining functionality.  Applicant cites *In re Bose*, 772 F.2d 866, 227 USPQ 1 (Fed. Cir. 1985), where the court stated:

> The board did not err in looking to the
> patents, as it stated, only insofar as the
> disclosure contained "evidence of the
> functionality of the outline shape sought to be
> registered as a trademark."  *In re Deister
> Concentrator Co.*, 289 F.2d 496, 501, 129 USPQ
> 314, 319 (CCPA 1961).  *Cf. Cable Electric
> Products, Inc. v. Genmark, Inc.*, [770 F.2d
> 1015], 226 USPQ 881, 891 [] (Fed. Cir.
> 1985)(readability of patent claims on structure
> is not test of functionality for trademark
> purposes).

*In re Bose*, 227 USPQ at 6 (emphasis in original).

We are not persuaded by applicant's argument.  We note that in the cited reference in *In re Deister Concentrator Co.* (129 USPQ at 319), the court did not distinguish between patent claims and patent disclosures, stating merely that "[w]e, therefore, see no reason to consider appellant's patents except to the extent they may contain evidence of the functionality of the outline shape sought to be registered as a trademark."  Likewise, despite the *Bose* court's language in its *Cable Electric Products* citation parenthetical quoted above, we note that the court in *Cable Electric Products* had simply stated that

> [i]n resolving the question of product design functionality for purposes of the Lanham Act, section 43(a), the fact finder is to consider the appearance of the *products* in issue. Reference to utility patent claims that are, or have been, asserted to read on either product, or to the appearance of the device depicted in figures included in the patent specification supporting such claims, must be done with caution.  ...  Claims may be capable of reading on many devices of strikingly different configuration.  Thus, even the fact that the claims read on two commercial devices in the marketplace is not support in itself for a finding that one is a copy of the other or confusingly similar thereto for section 43(a) purposes.  ...  Hence, for purposes of evaluating the existence or impact of product copying, the relevance of patent figures depends on the extent to which their appearance is replicated in the actual marketplace product

10

> of the patentee.  We have been shown no Ninth
> Circuit precedent to the contrary.

*Cable Electric Products, supra*, 226 USPQ at 891 (emphasis in original).  The court's analysis thus appears to relate to the relevance of the patent claims to the confusing similarity issue in a Section 43(a) false designation of origin case, rather than to the pertinence, *vel non*, of the patent claims to the functionality issue.

In any event, to the extent that the *Bose* court's above-quoted statement might be read as standing for the proposition that patent claims are irrelevant to the functionality determination, we believe that it is superseded by the Supreme Court's decision in *TrafFix*, in which the Court repeatedly referred to a patent's claims as evidence of functionality.  *See TrafFix*, 58 USPQ2d at 1005, 1006 (emphasis added):  "[a] utility patent is strong evidence that the features therein claimed are functional"; "[w]here the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional..."; "[i]n the case before us, the central advance claimed in the expired utility patents (the Sarkisian patents) is the dual-spring design"; "...the strong evidentiary inference of functionality based on the

11

disclosure of the dual-spring design in the <u>claims</u> of the expired patents"; "[t]he rationale for the rule that the disclosure of a feature in the <u>claims</u> of a utility patent constitutes strong evidence of functionality is well illustrated in this case."

Finally, although we may and must look to the patent's claims in determining functionality, we are not limited to review of the claims. As noted by Professor McCarthy in his discussion of *TrafFix*, "...while the Court continually talked about the evidentiary weight of what appeared in the patent claims, in fact the Court did not restrict the evidentiary use of a utility patent to its claims. The Supreme Court used both disclosures in the specification and argument made in the prosecution history as persuasive evidence of functionality." <u>McCarthy</u>, *supra*, at §7:89. Likewise, McCarthy notes that "[i]t is proper to look to the disclosure (as distinguished from the claims) in a utility patent as evidence of the functionality of a shape. The Trademark Board has held that each embodiment of the invention described in a utility patent is equally functional for purposes of trademark law." <u>McCarthy</u>, *supra*, at 7:89.1, citing *In re Bose*, *supra*, and *In re Edwards Ski Products Inc.*, 49 USPQ2d 2001 (TTAB 1999).

12

Thus, in this case, we have reviewed applicant's utility patent as a whole, including its claims, in determining functionality under the first *Morton-Norwich* factor.

The evidence of record in this case includes applicant's now-expired U.S. Patent No. 4,774,938. We have examined this utility patent in detail, and we set forth below what we deem to be those excerpts from the patent which are pertinent to our analysis and/or helpful to the reader in understanding applicant's invention:

SLOW RECOVERY EARPLUG WITH LARGELY IMPENETRABLE
SURFACE

ABSTRACT

An earplug of the slow recovery type is
described, which has open cells for expelling
gas to the outside during compression, but
which resists the entry of water through the
outside and the soiling of the outside by dirt.
The earplug includes a body formed of pressure-
molded slow recovery resilient foam material
forming multiple gas-filled shells. The plug
body has a surface region forming a skin
wherein the average cell cross-sectional area
is less than half that of cells at the center
of the body, and is less than one-tenth
millimeter, the surface region being primarily
continuous.

BACKGROUND OF THE INVENTION

Slow recovery earplugs, such as the type
described in U.S. Pat. No. Re. 29,487 have
gained wide acceptance. Such earplugs can be

13

rolled in the fingers to a small diameter, inserted into the ear, and allowed to expand over a period of between a few seconds to a few minutes to completely fill the end of the user's ear canal. Such earplugs have been previously formed by punching cylinders out of a thick sheet of slow recovery material, which is generally an open cell foam that allows air to escape when squeezing the earplug before insertion. Such earplugs easily pick up water or other fluids which hamper their use. Also, the multiple cut cells at the surface tend to pick up dirt, especially when a worker with dirty hands rolls the earplug between his fingers to compress it prior to insertion. A slow recovery earplug which resisted soiling and the pickup of water at its surface would be more sanitary and have a longer lifetime of use.
(Column 1, lines 1-23.)

## SUMMARY OF THE INVENTION

In accordance with one embodiment of the present invention, a slow recovery earplug is provided, which resists soiling especially during squeezing of the earplug to fit into the ear. The earplug includes a main body formed of pressure-molded slow recovery resilient foam plastic material that forms multiple gas-filled shells. The average cell diameter within the body decreases at locations progressively closer to the outside surface of the earplug, to provide a somewhat smooth surface which is devoid of large cells that could pick up dirt. The surface region forms a smooth skin that is largely imperious [sic – impervious] to solid and liquid contaminants. ...

The novel features of the invention are set forth with particularity in the appended claims. The invention will be best understood from the following description when read in conjunction with the accompanying drawings.
(Column 1, lines 25-42.)

...

14



**U.S. Patent**      Oct. 4, 1988      **4,774,938**

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Fig. 1 illustrates a slow recovery earplug 10 which includes **a largely bullet-shaped main body portion 12 and a flared rear end 14. As indicated in Fig. 2, the main body portion is designed to be compressed to the configuration shown at 12A (FIG. 2) so it can be inserted into the ear canal C of a person. During a period of about one minute, the earplug expands to near its uncompressed configuration, and presses against the walls of the ear canal to block noise. ...**
(Column 1, line 62 to Column 2, line 5. Emphasis added.)

...

The present earplug 10 is pressure molded from a slow recovery urethane foam material. This is accomplished by mixing the foam materials, placing them in a mold having a cavity **of the shape shown in FIG. 1**, and closing the mold, with a very small opening for escape of air such as a slit of about 0.2 millimeters width. The amount of foamable material is sufficient to fill a cavity of a volume greater than that of the finished

15

earplug, so the material expands to the full size of the cavity and then presses with considerable pressure against the walls of the cavity.  ...

(Column 2, lines 18-28.  Emphasis added.)

...

**The flanged or flared rear end 14 of the earplug limits the depth of insertion of the earplug into the ear, and also provides a region to be grasped to remove the earplug from the ear canal.  Because of the flange, users tend to roll only the bullet-shaped or largely cylindrical body 12, while leaving the flanged end 14 at its full size.  This reduces the possibility of deep insertion of the compressed earplug into the ear, and it reduces the difficulty of removing the earplug.  ...**

(Column 3, lines 27-35.  Emphasis added.)

...

**What is claimed is:**
1.  An earplug comprising:
an earplug body having **a main body portion forming a largely cylindrical outer surface and constructed to enable its reception in the ear and having outer walls adapted to directly contact the surface of the ear canal**, said body formed of pressure-molded slow recovery resilient foam plastic material forming multiple gas-filled open cells which permits rolling of the main body portion to a temporarily reduced diameter, with the average cross-sectional area of cells being less near substantially the entire **largely cylindrical surface of the main body portion** than at the middle of the cross-section of the main body portion, said out walls being porous to allow the escape of air.
2.  The earplug described in claim 1 wherein:
said plastic material is a urethane foam which has been molded under a pressure of at least about 0.5 psi in a closed mold.

16

3. The earplug described in claim 1 wherein:

said **largely cylindrical main body portion** has a predetermined length and has a diameter of about 11 millimeters along most of its length, and said body is formed of urethane foam.

4. The earplug described in claim 1 wherein:

**said body has a flared rear end of greater diameter than said main body portion, said main body portion having a predetermined length and being of substantially uniform width along most of its length, whereby to encourage rolling of only the main body portion but not the rear end.**

5. An earplug comprising:

**an earplug body having a largely bullet-shaped main body portion having an outer surface of a substantially circular cross-section of a width of about 11 millimeters for fitting into a human ear canal, and having a flared rearward portion of greater diameter than said main body portion**, said body constructed of a pressure-molded slow recovery urethane foam forming multiple cells;

said main body portion having numerous gas-filled visible open cells that are each of a diameter of a plurality of thousandths inches, the average cross-sectional area of said visible open cells in a region within one-half millimeter of said **substantially circular outer surface** being less than half the average cell cross-sectional area of said visible cells within the central 5 millimeters of the width of said main body portion.

6. The earplug described in claim 5 wherein:

said visible cells include a plurality of large cells of diameters of a plurality of tenths of millimeters, in each square millimeter of said central 5 millimeters of width; and

said main body portion has a pressure-molded skin of a thickness on the order of one-twentieth millimeter, which is substantially continuous.

(Column 4, line 29 to column 6, line 10. Emphasis added.)

17

It appears that a primary focus of the patented invention is the composition of the foam material out of which the earplug is formed (i.e., the foam consists of gas-filled cells which are larger in the center of the earplug than at the outside surface of the earplug, in order to better resist soiling and the pickup of water). However, it is clear that the patent also specifically discloses and claims the functional advantages of the shape of the earplug, i.e., the shape depicted in applicant's trademark application drawing and in applicant's description of the mark. That description of the mark states that "[t]he mark consists of a bullet-shaped earplug with a vertical axis, a rounded bottom, and a radially outwardly flared top." Claim 5 of the patent, in very similar terms, claims "an earplug comprising: an earplug body having a largely bullet-shaped main body portion ... and having a flared rearward portion of greater diameter than said main body portion." (Column 4, lines 62-68.) The patent's Description of the Preferred Embodiment likewise specifically identifies an earplug which includes "a largely bullet-shaped main body portion 12 and a flared rear end 14" (Column 1, lines 65-67), and states that the earplug is formed by placing the foam materials "in a mold

having a cavity of the shape shown in FIG. 1" (Column 2,
lines 19-21).

The elements of the shape of the earplug, as disclosed
and claimed in the patent, are not arbitrary or ornamental
flourishes, nor are they merely incidental to the design
and function of the earplug. Claim 1 specifies that the
main body portion of the earplug has "a largely cylindrical
outer surface" which is "constructed to enable its
reception in the ear and having outer walls adapted to
directly contact the surface of the ear canal." (Column 4,
lines 30-35.) The cylindrical shape thus is not arbitrary
or ornamental but instead serves an essential function,
i.e., it allows the body of the earplug to directly contact
the surface of the human ear canal, which likewise is
cylindrical in shape. (FIG. 2 at C.) The patent
repeatedly refers to the cylindrical shape of the main body
portion of the earplug.

Likewise, the flanged or flared rear end of the
earplug is not an arbitrary or incidental design flourish,
but rather is essential to the proper functioning of the
earplug. "Because of the flange, users tend to roll only
the bullet-shaped or largely cylindrical body 12, while
leaving the flanged end 14 at its full size. This reduces
the possibility of deep insertion into the ear, and it

reduces the difficulty of removing the earplug." (Column 3, lines 30-35.) See also Claim 4, which specifies that the earplug "has a flared rear end of greater diameter than said main body portion, ... whereby to encourage rolling of only the main body portion but not the rear end." (Column 4, lines 56-61.)

In the patent's Description of the Preferred Embodiment, the text at Column 1, line 68 to column 2, line 5, reads as follows:

> As indicated in Fig. 2, the main body portion
> is designed to be compressed to the
> configuration shown at 12A (FIG. 2) so it can
> be inserted into the ear canal C of a person.
> During a period of about one minute, the
> earplug expands to near its uncompressed
> configuration, and presses against the walls of
> the ear canal to block noise.

Applicant repeatedly argues that this language establishes that the shape of its earplug is not essential to the use or purpose of the earplug, and thus is not functional under the law, because it shows that "any shape, formed of slow recovery foam material, will work, provided it is larger than the ear canal." (Supplemental Appeal Brief at 3, 6, 10, 13, 15, and 17.) Applicant argues that the description in the patent refers to the "bullet-shaped main body portion" and the "flared rear end" only incidentally, and

notes that the Abstract in the patent describes the invention without mentioning these features. Applicant argues that claims 1-4 of the patent likewise make no mention of the "bullet-shaped main body portion," and that they therefore are not limited to earplugs having such a configuration.

We are not persuaded by these arguments. Rather, we find that applicant's expired utility patent is strong evidence of the functionality of the earplug configuration applicant seeks to register. The bullet-shaped main body portion is one of only a few possible reasonable variations of the "cylindrical" shape repeatedly claimed and disclosed in the patent. The bullet-shaped main body (which allows for direct contact with the cylindrical surface of the ear canal) and the flared rear end (which helps prevent too-deep insertion and assists in removal of the earplug) are specifically claimed in Claim 5 of the patent, and are specifically disclosed in the first sentence of the patent's Description of the Preferred Embodiment. These features are more than merely *de facto* functional; rather, the patent shows that the earplug is in this shape because it works better in this shape. Both the disclosures and the claims of the patent reveal that the shape of the earplug is not a mere arbitrary, ornamental or incidental

21

flourish, but rather serves an essential function in the use of the earplug, and affects the quality of the earplug.

In short, applicant's expired utility patent demonstrates the utilitarian advantages of the earplug design at issue, and we find that the first *Morton-Norwich* factor accordingly weighs heavily in favor of a finding of functionality.

There is no evidence of record showing that applicant touts the utilitarian advantages of its earplug design in its advertisements, nor that the design results in a comparatively simple or cheap method of manufacturing the product. The second and fourth *Morton-Norwich* factors accordingly do not support a finding of functionality in this case, and these factors are neutral in our analysis.

The third *Morton-Norwich* factor contemplates consideration of evidence of the availability to competitors of functionally equivalent designs. Regarding the applicability of this factor after the Supreme Court's decision in *TrafFix*, the Federal Circuit has noted, first, that the Court in *TrafFix*

> reaffirmed the "traditional rule" of *Inwood* that "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." The Court further held that once a product feature is found to be functional under

22

this "traditional rule," "there is no need to proceed further to consider if there is competitive necessity for the feature," and consequently "[t]here is no need ... to engage ... in speculation about other design possibilities. ... Other designs need not be attempted."

*Valu Engineering Inc. v. Rexnord Corp.*, *supra*, 61 USPQ2d at 1427. (Citations omitted.) The Federal Circuit then continued:

Nothing in *TrafFix* suggests that consideration of alternative designs is not properly part of the overall mix, and we do not read the Court's observations in *TrafFix* as rendering the availability of alternative designs irrelevant. Rather, we conclude that the Court merely noted that once a product feature is found functional based on other considerations[9] there is no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available. But that does not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place.

*Id.*

In this case, as discussed above, we find that applicant's expired utility patent, which specifically discloses and claims the utilitarian advantages of

---

[9] The Federal Circuit's footnote 5, inserted at this point in the quoted language, reads: "For example, a feature may be found functional where the feature 'affects the cost or quality of the device.' *TrafFix*, 121 S.Ct. at 1263."

applicant's earplug configuration and which clearly shows that the shape at issue "affects the ... quality of the device," is a sufficient basis in itself for finding that the configuration is functional, given the strong weight to be accorded such patent evidence under *TrafFix*. Thus, under the Supreme Court's *TrafFix* test as interpreted by the Federal Circuit in *Valu Engineering*, because these "other considerations" (i.e., the disclosures and claims of the patent) establish the functionality of the design, "there is no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available." *Valu Engineering, supra*, 61 USPQ at 1427.

However, even if we consider the evidence of alternative designs that appears in the record, we conclude that such evidence is insufficient to overcome the contrary evidence of the functionality of applicant's design as specifically disclosed and claimed in applicant's expired utility patent, giving due weight to the patent as required by *TrafFix*.

Applicant has submitted a photograph of eight earplugs of various shapes, along with the drawings from twenty

design patents for earplugs.[10]  Many of these alternative

earplug designs do not appear to be functional equivalents

to applicant's design because they lack either (or both) of

the design features claimed and disclosed in applicant's

expired utility patent, i.e., the cylindrical main body

portion which allows the earplug to conform to the shape of

the human ear canal, and the flared rear end which helps

prevent too-deep insertion of the earplug and which aids in

removing the earplug.  Applicant's earplug shape clearly is

one of but few possible alternative designs which provide

these features and serve these functions.

However, even if some of these alternative designs are

deemed to be functionally equivalent designs and thus are

evidence in support of a finding of non-functionality, we

find that this evidence is simply outweighed, in our

functionality analysis, by the clear and strong evidence of

---

[10] These are U.S. Patent Nos. D329,897, D335,342, D340,282, D341,656, D423,664, D307,635, D253,723, D371,840, D89,947, D97,038, D195,322, D234,321, D235,483, D236,162, D242,743, D264,249, D262,491, D273,614, D296,524 and D298,356.  Only the first six of these patents covers earplugs formed of slow recovery resilient foam material; the other fourteen are not formed of such material.  The significance of this distinction is not explained by applicant or readily apparent, but applicant filed an Addendum to Supplemental Brief in which it took pains to make the distinction, and in its briefs applicant repeatedly describes as relevant alternative designs only those earplugs which are made of slow recovery resilient foam material.  (See Supplemental Appeal Brief at 3, 6, 10, 13, 15, and 17.)  In an abundance of caution, however, we have considered all twenty design patents in our analysis under the third *Morton-Norwich* factor.

functionality contained in applicant's expired utility patent.

For the reasons discussed above, we find that the earplug design depicted in applicant's trademark application drawing is functional. Although there is no evidence of functionality under the second and fourth *Morton-Norwich* factors, and even if we consider the alternative design evidence of record under the third *Morton-Norwich* factor, we find that the strong evidence of functionality disclosed by applicant's expired utility patent, under the first *Morton-Norwich* factor and in accordance with the Supreme Court's decision in *TrafFix*, simply outweighs any contrary evidence which might support a finding of non-functionality.

Applicant's utility patent for the earplug has expired, and we are not persuaded by applicant's contention that the earplug configuration, with its functional advantages as disclosed and claimed in the patent, is now entitled to trademark registration. Rather, we find that the evidence of record establishes, *prima facie*, that applicant's design is functional, and that applicant has failed to rebut that presumption. Registration of the design as a trademark is barred under Trademark Act Section

2(e)(5), and we affirm the Trademark Examining Attorney's refusal on that ground.

## Acquired Distinctiveness

Because applicant's design is functional, any evidence of distinctiveness is of no avail to applicant in support of registration. *See TrafFix*, *supra*, 58 USPQ2d at 1007 ("Functionality having been established, whether MDI's dual-spring design has acquired secondary meaning need not be considered"). See also *M-5 Steel Mfg. Co. v. O'Hagin's Inc.*, 61 USPQ2d 1086 (TTAB 2001). However, in the interest of completeness, should applicant appeal and ultimately prevail on the issue of functionality, we also shall consider applicant's contention that its design has acquired distinctiveness and thus is registrable pursuant to Trademark Act Section 2(f).

A product configuration is not inherently distinctive, and (if non-functional) may be registered on the Principal Register only upon a showing of acquired distinctiveness under Section 2(f). *See Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 54 USPQ2d 1065 (2000). The burden of establishing acquired distinctiveness is on the applicant, who must establish acquired distinctiveness by a preponderance of the evidence. *Yamaha International*

27

*Corporation v. Hoshino Gakki Co., Ltd.,* 840 F.2d 1572, 6 USPQ2d 1001 (Fed. Cir. 1988).

In support of its acquired distinctiveness claim, applicant relies on the July 24, 2003 declaration of applicant's vice-president, Mark Hampton. In the declaration, Mr. Hampton states: that he believes that the earplug design has become distinctive as a mark due to applicant's substantially exclusive and continuous use for over fifteen years; that, in the years 2000-2002, applicant sold a total of over one billion earplugs incorporating the design in the United States, and sold over 294 million earplugs to purchasers outside the United States; that sales of the earplugs have been made in all fifty states, to hundreds of customers; and that applicant's advertising expenditures over the past three years (dating from July 2003) were approximately $1,564,000.

Also of record are samples of applicant's advertisements. One includes a prominently-featured logo depicting **MAX**® in stylized letters, a large picture of the earplug, and the following text:

> Maximum Security
> MAX® disposable earplugs control the toughest
> noise problems. Their NRR33 rating provides
> the highest protection available anywhere. The
> ultra-soft, contoured polyurethane foam is easy
> on the ears. And the price is easy on any

> budget.  For protection, for comfort, for value, MAX rules.
>
> Try 100 pairs of MAX earplugs FREE.  Just call 877.618.1905.  You'll like what you don't hear.

Another advertisement likewise includes the stylized MAX® logo in large size, a picture of the goods, and the following text:

> The highest NRR rating available!
> *MAX* (NRR 33) pre-shaped foam earplugs feature a smooth outer skin for maximum user comfort. The NRR 33 rating makes the *MAX* the best-selling highest-rated disposable earplug in the U.S.  The smooth, soil-resistant skin helps prevent dirt from penetrating the surface prior to insertion.  Attenuation tested in accordance with ANSI S3.19-1974.  Coral color, packed in poly bags.

This advertisement then identifies various models as follows:  MAX-1, MAX-1-PB, MAX-30, MAX-30-PB and MAX-5. Applicant also has submitted a photograph of its trade show booth, at which is featured a large sign bearing a photograph of the earplug along with text which we cannot discern.  Applicant's specimens of record are packaging for the earplugs, which bears the stylized logo mark MAX® in large size along with a drawing of the goods.

We find that the evidence of record fails to establish, *prima facie*, that applicant's earplug configuration has acquired distinctiveness as a trademark.

Applicant's claim of substantially exclusive[11] and continuous use for over fifteen years does not suffice, in this case, to demonstrate acquired distinctiveness. *See In re Gibson Guitar Corp.*, 61 USPQ2d 1948 (TTAB 2001)(sixty-six years of use insufficient to establish acquired distinctiveness). Applicant's asserted U.S. sales[12] of over one billion units in the years 2000-2002 is not particularly probative evidence of acquired distinctiveness, because although this seems like a large number, we cannot determine on this record what percentage of the market this number makes up. *See id*. ("As for the sales of 10,000 in a two-year period, again there is no evidence to show whether this is a large number of sales of guitars vis-à-vis the sales of other companies").[13] Moreover, although the sales figures might demonstrate that applicant has been successful in marketing its earplugs and

---

[11] We note that a few of the "alternative designs" submitted by applicant appear to look very similar to applicant's design, but we have no evidence as to the extent of use of these other designs or what effect their marketing might have had on applicant's claim of acquired distinctiveness.

[12] Applicant's sales of earplugs outside the United States are not probative evidence on the question of acquired distinctiveness in the United States.

[13] We note that one of applicant's advertisements asserts that "[t]he NRR 33 rating makes the *MAX* the best-selling highest-rated disposable earplug in the U.S." We find that this statement, even assuming its accuracy, is too vague and qualified to be reliable proof of applicant's share of the market for earplugs.

that customers find applicant's earplugs to be quality merchandise worth purchasing, we cannot determine, from the sales figures, that purchasers view the shape of the earplug as a mark.

Applicant's asserted advertising expenditure of over $1.5 million in the past three years likewise does not persuade us that applicant's earplug configuration has acquired distinctiveness as a trademark. Indeed, there is nothing in applicant's advertisements or packaging from which we could determine that purchasers have been conditioned or educated to look to the shape of the earplugs, per se, as a source indicator. The advertisements include no "look for" instructions which might encourage purchasers to view the shape of the earplug as a trademark. Secondary meaning occurs when "in the minds of the public, the primary significance of [the configuration] is to identify the source of the product rather than the product itself". *Wal-Mart Stores, Inc., supra*, 54 USPQ2d at 1068. The photographs or drawings of the earplugs contained in applicant's advertisements and packaging would be used by purchasers to identify the product itself, and not the source of the product. Although applicant is correct in contending that goods may be sold under more than one mark, in this case applicant's

advertisements and packaging encourage purchasers to view only the designation MAX® as the trademark for the goods; the shape of the goods would not be perceived as a mark.

In short, assuming that applicant's earplug design is not functional, we find that applicant has failed to establish, *prima facie*, that the design has acquired distinctiveness as a trademark. The design therefore is not registrable on the Principal Register pursuant to Section 2(f).

Decision: The Section 2(e)(5) functionality refusal is affirmed. Alternatively, we affirm the refusal on the ground that the configuration, if not functional, is non-distinctive and has not acquired distinctiveness.