THIS OPINION IS A
PRECEDENT OF THE
T.T.A.B.

Mailed: January 7, 2011

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Charles N. Van Valkenburgh
_____

Serial No. 77025789
_____

Christopher J. Bischoff of Bischoff & Associates, Ltd. for Charles N. Van Valkenburgh.

Toby E. Bulloff, Trademark Examining Attorney, Law Office 117 (J. Brett Golden, Managing Attorney).
_____

Before Bucher, Grendel and Bergsman,
Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Charles N. Van Valkenburgh ("applicant") filed an application to register the mark shown below



for "motorcycle stands" in International Class 12.  The application includes the following description of the mark sought to be registered:

> The mark consists of the three dimensional configuration and associated trade dress of a motorcycle stand.  The material shown in the dotted lines serves to show the position of the mark on the goods and is not claimed as part of the mark.

Applicant seeks registration on the Principal Register under the provisions of Section 2(f) of the Trademark Act of 1946, 15 U.S.C. § 1052(f).  Applicant claimed first use of the mark anywhere and first use of the mark in commerce on August 20, 1994.  Attached below is the specimen displaying the proposed mark.



Attached below is an excerpt from applicant's website displaying the motorcycle stand incorporating the proposed mark in use.



The trademark examining attorney refused registration under Section 2(e)(5) of the Trademark Act, 15 U.S.C. §1052(e)(5), on the ground that applicant's proposed mark is functional. Alternatively, if the proposed mark is not functional, the trademark examining attorney refused registration on the ground that the proposed mark has not acquired distinctiveness.[1]

A.    Whether the proposed mark is functional?

Section 2(e)(5) of the Trademark Act precludes registration of "any matter that, as a whole, is functional." The Supreme Court has stated: "In general terms, a product feature is functional if it is essential

---

[1] Because the subject matter sought to be registered is a product design, it is not inherently distinctive, and it is registrable only with a showing of acquired distinctiveness. *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.,* 529 U.S. 205, 54 USPQ2d 1065, 1067 (2000).

to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982). The Supreme Court has called this "*Inwood* formulation" the "traditional rule" of functionality. *TrafFix Devices Inc. v. Marketing Displays Inc.*, 532 U.S. 23, 58 USPQ2d 1001, 1006 (2001).

The functionality doctrine is intended to encourage legitimate competition by maintaining the proper balance between trademark law and patent law. As the Supreme Court observed in *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 34 USPQ2d 1161, 1163-64 (1995):

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity). That is to say, the Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is

> the purpose of the patent law and its
> period of exclusivity.  The Lanham Act,
> furthermore, does not protect trade
> dress in a functional design simply
> because an investment has been made to
> encourage the public to associate a
> particular functional feature with a
> single manufacturer or seller.

The Federal Circuit, our primary reviewing court, looks at four factors when it considers the issue of functionality:  (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product.  *Valu Engineering Inc. v. Rexnord Corp*., 278 F.3d 1268, 61 USPQ2d 1422, 1426 (Fed. Cir. 2002), *citing In re Morton-Norwich Products, Inc*., 671 F.2d 1332, 213 USPQ 9, 15-16 (CCPA 1982).  These are known as the "*Morton-Norwich* factors."  The determination of functionality is a question of fact, and depends on the totality of the evidence presented in each particular case.  *In re Udor U.S.A. Inc.*, 89 USPQ2d 1978, 1979 (TTAB 2009).  The Supreme Court's decision in *TrafFix* has not altered the *Morton-*

Ser. No. 77025789

*Norwich* analysis.  *See Valu Engineering, Inc. v. Rexnord Corp.*, 61 USPQ2d at 1427.

    1.   <u>The existence of a utility patent disclosing the utilitarian advantages of the design.</u>

The first *Morton-Norwich* factor is the existence of a utility patent disclosing the utilitarian advantages of the design.  Regarding the evidentiary value of utility patents in the functionality determination, the Supreme Court has instructed as follows:

> A prior patent, we conclude, has vital significance in resolving the trade dress claim.  A utility patent is strong evidence that the features therein claimed are functional.  If trade dress protection is sought for those features the strong evidence of functionality based on the previous patent adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection.  Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental or arbitrary aspect of the device.

*TrafFix Devices Inc. v. Marketing Displays Inc.*, 58 USPQ2d at 1005.

The particular motorcycle stand in question is applicant's PIT BULL motorcycle stand.  Motorcycle stands

6

are used to hold the motorcycle when performing maintenance. "Many maintenance tasks require removing the front wheel and therefore a stand to lift the front of a motorcycle must connect to the base of the forks or a position underneath the steering stem to give access to the front axle."[2]

Applicant is the owner of U.S. Patent No. 7,000,901 for a motorcycle stand. The drawing of the invention is set forth below.



---

[2] U.S. Patent No. 7,000,901, "Background of the Invention," attached to the July 20, 2007 Office Action. *See also* U.S. Patent No. 7,100,928.

Ser. No. 77025789

"The drawing in a nonprovisional application must show every feature of the invention specified in the claims. However, conventional features disclosed in the description and claims, where their detailed illustration is not essential for a proper understanding of the invention, should be illustrated in the drawing in the form of a graphical symbol or a labeled representation (*e.g.,* a labeled rectangular box)."  37 CFR 183(a).

The "detailed description of the invention" provides the following information, so far as pertinent (emphasis in the original):[3]

> [T]he embodiment of the stand of the present invention has a base support frame designated at **12** … A pair of horizontally, forwardly disposed members **19,20** are connected to upwardly disposed parallel members **14,15**. Members **19,20** are rigidly connected by means of a transverse member **21**. Extending forward from transverse member **21** is a handle **22** that is used to leverage base support frame **12** during operation of the stand.

The "detailed description of the invention" identifies "the precise invention for which a patent is solicited, in such manner as to distinguish it from other inventions and from what is old.  It must describe completely a specific

---

[3] The numbers in the "detailed description of the invention" reference the numbers in the drawing.

8

Ser. No. 77025789

embodiment of the process, machine, manufacture, composition of matter or improvement invented, and must explain the mode of operation or principle whenever applicable.  The best mode contemplated by the inventor of carrying out his invention must be set forth."  37 CFR 1.71(b); *see also* 35 U.S.C. § 112 ("The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention").  "The best mode requirement is a safeguard against the desire on the part of some people to obtain patent protection without making a full disclosure as required by the statute.  The requirement does not permit inventors to disclose only what they know to be their second-best embodiment, while retaining the best for themselves."  MPEP § 2165 *citing In re Nelson and Shabica*, 280 F.2d 172, 126 USPQ 242, 253 (CCPA 1960).

Applicant claims as his invention the following, in pertinent part:

9

Ser. No. 77025789

What I claim is:

1.  A front motorcycle stand comprising

a.   a supporting base comprising two upwardly disposed parallel members with an upper end and a lower end, each of said parallel members having a wheel attached to said lower end to facilitate rolling along the ground; said supporting base also comprising two forwardly disposed horizontal frame members with a forward end and rearward end attached to said lower end of said upwardly disposed members; a transversely disposed cross member attached to said forward end of each of said horizontally disposed members to rigidly affix said horizontal members to one another; and handle attached to said cross member for leveraging end of said supporting base; …

The claim specifically identifies the invention.  37 CFR 1.75(a) ("The specification must conclude with a claim particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention or discovery"); *see also* 35 U.S.C. § 112.

U.S. Patent No. 7,000,901 incorporates the proposed mark and the configuration of the proposed mark is a necessary element of the invention:  that is, the design of the proposed mark constitutes the base of the motorcycle stand as referenced by the numbers 12 and 19-22 in the patent drawing.  Accordingly, applicant has incorporated

10

the best mode of the invention with respect to the base of the motorcycle stand to obtain the advantages that result therefrom (*i.e.,* "used to leverage base support frame during operation of the stand").  The fact that the proposed mark comprises less than the entirety of the invention claimed in the patent is not dispositive.

> We do not find it necessary that the configuration designs for which trademark protection is sought be "virtually identical to the invention described and claimed" in the patent or that the patent must "cover" all facets of the proposed marks.  Instead we look to the features disclosed in the patent which have been incorporated into the present product designs and the teachings of the patent with respect to these features.

*In re Visual Communications Co.,* 51 USPQ2d 1141, 1143 (TTAB 1999).  The proposed mark adopts a significant portion of the invention disclosed in the patent; it is not merely an ornamental, incidental, or arbitrary aspect of the motorcycle stand.

Applicant argues that "a careful and detailed reading and analysis of the entire patent shows that Applicant's mark is not described in the patent."[4]  (Emphasis in the original).  We disagree.  As indicated above, the invention described in the patent and the proposed mark do not have

---

[4] Applicant's Brief, p. 8.

11

to be identical for the patent to read on or apply to the proposed mark.

Applicant argues, in the alternative, that even if the patent describes the proposed mark, the patent does not disclose any utilitarian advantages of the proposed mark.[5] To the contrary, applicant was required to present the best mode of the invention and the patent discloses that the design of the base is used to leverage support during operation. The summary of the invention provides, in pertinent part, that "[t]he bass (sic) portion consists of a pair of arms to which are affixed a pair of fulcrum wheels and a handle for operation." Accordingly, the proposed mark is necessary to the operation of the motorcycle stand particularly, where as here, the proposed mark is identified as the best mode for carrying out the invention.

Finally, we note that applicant states that he designed his motorcycle stand to be "reminiscent of the distinctive physical appearance of a pit bull dog. … The distinctive configuration and profile of Pit Bull motorcycle stands does in fact and by my intentional design, resemble the profile and physical characteristics

---

[5] Applicant's Brief, p. 9.

12

of a pit bull dog."[6]  However, if there is no reason for the motorcycle stand to have its particular design other than for ornamental or decorative reasons, then we are left with the unanswered question as to why applicant claimed the features of the proposed mark in its utility patent.

In view of the facts that the drawing of the invention in U.S. Patent No. 7,000,901 incorporates the proposed mark, the "detailed description of the invention" describes the proposed mark, and Claim 1(a) of the patent claims the proposed mark as part of the subject matter of applicant's invention, we find that the patent is *prima facie* evidence that the proposed mark is functional.  In the face of this showing, it was incumbent upon applicant to rebut why the patent does not disclose the utilitarian advantages of the proposed mark.  *See Textor, Inc. v. U.S. Int'l Trade Comm'n*, 753 F.2d 1019, 1025 (Fed. Cir. 1986) (stating that once a *prima facie* case of functionality is made by an opponent, the burden shifts to the applicant to prove that the design is nonfunctional).  Applicant's arguments do not persuade us that the features of the proposed mark described in the patent are not functional.  Perhaps not

---

[6] Applicant's Declaration, ¶4 attached to applicant's May 16, 2007 Response; *see also* the Foley Declaration ("Other than attempting to resemble the physical features of a pit bull dog, there are no obvious functional reasons the configuration of the Pit Bull motorcycle stand needs to be as designed").

surprisingly, the handle on each motorcycle stand shown in this record provides leverage action critical to getting the bike on the stand. Similarly, the "horizontally, forwardly disposed members [that] are rigidly connected by means of a transverse member," describes a characteristic shared by substantially all the motorcycle stands of competitors. Applicant and Mr. Foley base their conclusions that the proposed mark is not functional on the fact that there are alternative designs for motorcycle stands. However, neither applicant nor Mr. Foley explained why the design of the supporting base of the stand, as shown in the proposed mark, is not essential to the function or purpose of the motorcycle stand or why it did not affect quality of the product. Thus, the applicant has failed to carry the "heavy burden of showing that the feature is not functional." *Traffix*, 58 USPQ2d at 1005. In view of the foregoing, we find that the patent constitutes strong evidence of functionality.

2. Advertising materials in which the originator of the design touts the design's utilitarian advantages.

An applicant's own advertising touting the utilitarian aspects of its product design is strong evidence supporting a functionality refusal. In this case, however, prior to publishing his website, applicant had "not created any

14

advertising, promotional and/or explanatory materials

concerning the configuration for which registration is

sought, particularly any material specifically related to

the design feature(s) embodied in the proposed mark."[7]

Without any advertising by the applicant on which to rely,

the examining attorney turned to promotional materials

published by applicant's competitors touting the functional

features of motorcycle stands that incorporate the design

of the proposed mark. *See In re Gibson Guitar Corp.*, 61

USPQ2d 1948, 1951 (TTAB 2001) (referencing the

advertisement of a competitor that used the identical shape

to the configuration sought to be registered). The

advertisements set forth below have been made of record.

    1.   T-Rex Racing[8]



---

[7] Applicant's Declaration, ¶3 attached to applicant's May 16, 2007 Response.
[8] November 16, 2006 Office Action. We note that the T-Rex Racing stand has triangular braces on the base.

> The spool/universal stand was designed to allow a superb sturdy, non-flex performance. … Extended arm provide (sic) extra leverage.

2. Power Stands[9]



Low effort one hand lift

3. Cycle Cat[10]



> [w]e created a system which takes bike from sidestand to rearstand in one motion, and which is so stable and easy to use, that it is not even necessary to touch the motorcycle.

\*     \*     \*

---

[9] July 20, 2007 Office Action.
[10] *Id.*

> [t]he UCS1 provides a stable solid work platform. … The whole system is so strong, and its geometry so correct, that a bike can easily be rolled around while on the stand.

4.   Pit Posse[11]



### Posse Rear Combo Stand

- This stand is fresh off the drawing board and built to last
- Design will allow use of standard rear type stand or spool type
- Simply unbolt and flip hardware over to desired setting (spool or paddle)
- Constructed from heavy duty 1½" tubing
- Ensured stability with four 4" wheels with bearings for smooth movement
- Stand width will adjust from 8-3/4" to 13-3/4"
- Universal design to fit most all standard swing arm sportbikes

$79.95

Retail price: $89.95

While applicant's patent covers a stand for holding up the front end of a motorcycle, the T-Rex Racing, Cycle Cat, and Pit Posse products are explicitly advertised as rear stands. However, there is no basis in this record to believe that a supporting base of the type shown in applicant's proposed mark would not work equally well as the supporting base for a rear stand. In this regard, applicant's description of goods is simply "motorcycle stands," without any limitation as to use in the front or rear. We also note that neither applicant nor Mr. Foley made any distinction between the use of motorcycle stands for the front and rear of the motorcycle. Accordingly, we find that for purposes of our functionality analysis, there

---

[11] *Id.*

17

is no difference between the supporting bases of a front or rear motorcycle stand.

Applicant argues that the advertising does not describe, explain or reference any utilitarian aspects or advantages of the proposed mark; rather the advertising makes general statements that could be attributed to any motorcycle stand.[12]  We disagree.  Statements such as "designed to allow a superb sturdy, non-flex performance," "[e]xtended arm provide (sic) extra leverage," "[l]ow effort one hand lift," "extraordinarily easy to use," "[t]he whole system is so strong, and its geometry so correct, that a bike can easily be rolled around while on the stand," and "[u]niversal design to fit all standard swing arm sportbikes" relate specifically to the design of the supporting base incorporated into applicant's proposed mark.  Thus, we find that the advertisements by applicant's competitors tout the utilitarian advantages of motorcycle stands similar, if not identical, in design to the proposed mark in more than just generalized statements.

3.   The availability to competitors of functionally equivalent designs.

The third *Morton-Norwich* factor involves consideration of alternative designs.  The Federal Circuit has indicated

---

[12] Applicant's Brief, pp. 9-10; Applicant's Reply Brief, pp. 8-9.

that competition "is the crux of the functionality inquiry." *Valu Engineering*, 61 USPQ2d at 1427 (internal citations omitted). The availability of alternative designs is relevant to show that the design sought to be registered will "preserve competition by ensuring competitors the right to compete effectively." *Id.*; *In re Morton-Norwich Products, Inc.,* 213 USPQ at 13. The Federal Circuit has noted, however, that the mere fact that other designs are available does not necessarily mean that applicant's design is not functional. In this regard, the Federal Circuit has noted that the mere fact that other designs are available does not necessarily mean that applicant's design is not functional. *In re Bose*, 772 F.2d 866, 227 USPQ 1, 5-6 (Fed. Cir. 1985) ("That another type of [design] would work equally as well does not negate that this [design] was designed *functionally* to enhance or at least not detract from the rest of the system … If the feature asserted to give a product distinctiveness is the best, or at least one, of a few superior designs for its *de facto* purpose, it follows that competition is hindered. *Morton-Norwich* does not rest on total elimination of competition in the goods." (emphasis in original)).

In connection with its argument that there are many equally feasible, efficient and competitive designs,

applicant submitted photographs of what it considers being "well over 85 alternative designs for motorcycle stands."[13] Applicant contends that these designs are "a strong indication that competition has not and will not be hindered by applicant's registration of the proposed mark."[14]

However, the availability of alternative designs does not convert a functional design into a non-functional design. *TrafFix*, 58 USPQ2d at 1007 ("Here, the functionality of the spring design means that competitors need not explore whether other spring juxtapositions might be used. The dual-spring design is not an arbitrary flourish in the configuration of MDI's product; it is the reason the device works. Other designs need not be attempted"). Similarly, a handle connected perpendicularly to a transverse member rigidly connected to horizontally disposed members on a supporting base "is not an arbitrary flourish." Beyond this basic structure, and without any formal explanation of the specific elements which applicant claims as its mark, registration of the claimed matter could well hinder competitors who would not know if the

---

[13] Applicant's Brief, p. 12. We do not agree that applicant's evidence demonstrates 85 different alternative designs because many of purported different designs are the same. Nevertheless, there are alternative designs for motorcycle stands.
[14] *Id.*

features they used in the supporting base of their motorcycle stands, whose overall configurations are not dissimilar from those of applicant, might well subject them to a suit for trademark infringement.

4. Facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product.

The fourth and final factor is a consideration of whether applicant's design results from a comparatively simple or cheap method of manufacture. Applicant submitted the declaration of Michael J. Foley, an engineer "employed in the analysis of mechanical and structural systems," and who is also "a motorcyclist who's familiar with and used motorcycle stands for many years." In pertinent part, Mr. Foley states the following:

> [Applicant's] product configuration at issue is based on and results from a comparatively complicated, difficult, and expensive method of manufacture in relation to alternative designs for motorcycle stands. The manufacturing of these stands involves tube bending and forming, as well as milling, welding, grinding, and deburring operations. This requires numerically controlled equipment, as well as special jigs and fixtures. To obtain [applicant's] distinctive product configuration, [applicant] uses high strength materials and state-of-the-art manufacturing processes which adds cost to the product.[15]

---

[15] Foley Declaration, p. 1, unnumbered paragraph No. 6.

Ser. No. 77025789

* * *

> [Applicant's] product configuration does not result from a comparatively simple or cheap method of manufacturing the stand. Based on design and manufacturing methods, I believe [applicant's] stand is likely one of the most expensive stands on the market due to the extra cost and steps required to produce the product configuration. Unlike [applicant's] stand, I believe the cheapest and most efficient motorcycle stand design would use square steel tubing, which is cheaper to transport, store, handle, cut, weld, saw, fabricate, and paint. I believe cheaper and more efficient designs would also use multiple triangular supports (truss-like supports) and gusseted welding plates to bridge together component parts and facilitate welding them together. The majority of alternative stand designs I have seen utilize these features. [Applicant] utilizes none of those features or cheaper manufacturing methods. I believe that [applicant's] product configuration comes at an added expense and increased costs for materials, labor, shipping, warehousing and handling.[16]

Attached below are representative samples of the alternative designs for motorcycle stands made of record by applicant.

---

[16] *Id.,* at p. 1, unnumbered paragraph No. 8.

 

 

 

---

[17] As noted earlier, these Black Widow motorcycle stands demonstrate the similar deployment of a handle, transverse member and horizontally disposed members used quite similarly on a front and a rear motorcycle stand.

Like applicant's product, these alternative designs use round steel tubing, not square steel tubing. Thus, the manufacturing of these alternative motorcycle stand designs would appear to also "involve[s] tube bending and forming, as well as milling, welding, grinding, and deburring operations. This requires numerically controlled equipment, as well as special jigs and fixtures."[18] Furthermore, these alternative designs featuring round steel tubing would not be "cheaper to transport, store, handle, cut, weld, saw, fabricate, and paint." Based on Mr. Foley's analysis of the manufacturing process, these alternative designs would have similar "costs for materials, labor, shipping, warehousing and handling." Accordingly, we find that the cost and complexity of manufacturing applicant's product design is comparable to some of his competitors. Nevertheless, even if applicant's motorcycle stands with this design are more costly to produce, a higher cost does not detract from its functionality. As stated in *TrafFix,* 58 USPQ2d at 1006, a product feature is functional "when it affects the cost **or** quality of the article." (Emphasis added). Thus, even at a higher manufacturing cost, applicant would have a

---

[18] *Id.,* at p. 1, unnumbered paragraph No. 6.

Ser. No. 77025789

competitive advantage for what is essentially, as claimed in the patent, a superior motorcycle stand.

In reviewing the *Morton-Norwich* functionality factors, we find that the proposed mark is an efficient and superior design for the supporting base of a motorcycle stand and, thus, functional.

B.    Whether the proposed mark has acquired distinctiveness?

Our holding that the design sought to be registered is functional bars registration, regardless of any showing of acquired distinctiveness. However, for purposes of completeness, we shall decide the alternative refusal that applicant's proposed mark has not acquired distinctiveness pursuant to Section 2(f) of the Trademark Act of 1946.

As indicated above, because the subject matter sought to be registered is a product design, it is not inherently distinctive, and it is registrable only with a showing of acquired distinctiveness. *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 54 USPQ2d at 1067. An applicant faces a heavy burden in establishing the distinctiveness of a product design. *Yamaha Int'l Corp. v. Hoshino Gakki Co. Ltd.*, 840 F.2d 1572, 1581, 6 USPQ2d 1001, 1008 (Fed. Cir. 1988); *In re Ennco Display Systems Inc.*, 56 USPQ2d 1279, 1284 (TTAB 2000).

25

The Examining Attorney's position is quite simple: applicant has failed to demonstrate that the product design is recognized as a trademark and consumers would perceive the proposed mark as nothing more than the design of the product. On the other hand, applicant contends that the proposed mark has acquired distinctiveness by virtue of the following "facts":

1.   <u>Exclusivity, length, and manner of use</u>.

"Applicant created and introduced its Pit Bull stand with its distinctive product configuration in August of 1994. As of today's date, Pit Bull's distinctive product configuration has been in continuous and exclusive use by Pit Bull for 16 years."[19]  Applicant asserts that his substantially exclusive and continuous use of the mark for 16 years is significant because "the segment of the motorcycle industry which purchases and uses motorcycle stands is relatively small and a close-knit community."[20]

2.   <u>Direct consumer testimony</u>.

"Applicant submitted fourteen (14) Declarations from consumers involved in the motorsports industry."[21]  This is

---

[19] Applicant's Brief, p. 20.
[20] Applicant's Brief, p. 20.
[21] Applicant's Brief, p. 18.

purportedly "a small sampling of what can be provided if requested and/or necessary."[22]

3.  Consumer surveys.

"Applicant submitted twenty three (sic) (23) consumer surveys from consumers involved in the motorsports industry."[23]  The surveys are purportedly "a small sampling of what can be provided if requested and/or necessary."[24]

4.  Established place in the market.

Applicant contends that "[d]ue to Pit Bull's hard earned record for superior customer service and their (sic) willingness to stand behind its products, Pit Bull stands are immensely popular and likely the motorcycle stand most recommended by those in the Motorsports industry."[25]

5.  Proof of intentional copying.

Applicant contends that motorcycle stands resembling his product "are the target of intentional copying.  This fact is supported by Applicant's Petition *To Make Special*."[26]

Nevertheless, we find that applicant has failed to establish that its proposed mark has acquired

---

[22] Applicant's Brief, p. 18.
[23] Applicant's Brief, p. 18.
[24] Applicant's Brief, p. 18.
[25] Applicant's Brief, p. 21.
[26] Applicant's Brief, p. 21 referencing applicant's Declaration, ¶5.

distinctiveness. First, applicant's 16 years of use is substantial but not necessarily conclusive or persuasive considering that its mark is a product configuration. *See In re R.M. Smith, Inc.*, 734 F.2d 1482, 222 USPQ 1, 3 (Fed. Cir. 1984) (eight years use was not sufficient evidence of acquired distinctiveness for the configuration of pistol grip water nozzle for water nozzles); *In re ic! berlin brillen GmbH*, 85 USPQ2d 2021, 2023-2024 (TTAB 2008)(five years of use is not sufficient to establish acquired distinctiveness for a configuration of an earpiece for frames for sunglasses and spectacles); *In re Ennco Display Systems Inc.,* 56 USPQ2d 1279, 1286 (TTAB 2000)(applicant's use of the product designs ranging from seven to 17 years is insufficient to bestow acquired distinctiveness); TMEP §1212.05(a) (7th ed. 2010) ("For matter that is not inherently distinctive because of its nature (e.g., nondistinctive product container shapes, overall color of a product, mere ornamentation, and sounds for goods that make the sound in their normal course of operation), evidence of five years' use is not sufficient to show acquired distinctiveness. In such a case, actual evidence that the mark is perceived as a mark for the relevant goods or services would be required to establish distinctiveness").

Ser. No. 77025789

Second, the statements in applicant's declaration indicate that the success of the PIT BULL motorcycle stand (*i.e.,* its established place in the market) is a result of the quality of the product and applicant's dedication to customer service.

> Although the distinctive look and configuration of the PIT BULL stand created disadvantages as compared to other stands … as a result of hard work, a quality product, substantial marketing and promotion, and a commitment to total customer satisfaction, Pit Bull Products and our stands have established themselves as an industry leader with substantial goodwill and recognition.[27]

The product's alleged position as an industry leader demonstrates the popularity or commercial success of the motorcycle stand, but it does not demonstrate that the purchasing public recognizes the product design as a source indicator. *See In re Bongrain International (American) Corp.,* 894 F.2d 1316, 13 USPQ2d 1727, 1729 (Fed.Cir. 1990) (growth in sales may be indicative of the popularity of the product itself rather than recognition of a term or design as denoting origin); *Goodyear Tire and Rubber Co. v. Interco Tire Corp. (US Pats),* 49 USPQ2d 1705, 1720 (TTAB 1998). As indicated above, applicant states that his

---

[27] Applicant's Declaration, ¶5.

motorcycle stand has become an industry leading product because of "hard work, a quality product, substantial marketing and promotion, and a commitment to total customer satisfaction."

Furthermore, applicant's assertion that his product is an industry leader is not supported by evidence of substantial sales from which we may infer the existence of acquired distinctiveness. *In re Hollywood Brands, Inc.,* 214 F.2d 139, 102 USPQ 294, 295-296 (CCPA 1954) (36 years of use with substantial advertising and sales supported the finding of acquired distinctiveness); *In re Crystal Geyser Water Co.,* 85 USPQ2d 1374, 1376 (TTAB 2007) ("Evidence of acquired distinctiveness can include the length of use of the mark, advertising expenditures, sales, survey evidence, and affidavits asserting source-indicating recognition"). In fact, applicant declined to provide sales figures or his number of customers on the ground that they are confidential business information. Applicant did not provide any information regarding his market share.

Applicant also declined to provide advertising figures explaining that he has "never needed to pay money to create, acquire or reinforce the existence of the secondary meaning that has attached to Pit Bull's distinctive product configuration. The acquired secondary meaning attached to

our product configuration was obtained as a result of natural market forces and consumer behavior."[28] With exception of the excerpt from its website, applicant did not produce any advertising or promotional material, because applicant "has not created any advertising, promotional and/or explanatory materials concerning the configuration for which registration is sought, particularly any material specifically related to the design feature(s) embodied in the proposed mark."[29]

We also note that applicant did not introduce any unsolicited publicity for its motorcycle stand that identified the product design as a trademark. Such publicity would have been probative that readers, authors, and others in the motorsports field identified the design of the motorcycle stand as a trademark.

With these marketing conditions in mind, we address the probative value of applicant's consumer surveys and declarations. While survey evidence is relevant to establish acquired distinctiveness, the proponent of the survey must document the procedural and statistical

---

[28] Applicant's Declaration, ¶15.
[29] Applicant's Declaration, ¶6. As indicated above, applicant contends that his motorcycle stands have become an industry leader with substantial recognition and goodwill, in part, because of "substantial advertising and promotion." *Id.* at ¶5. Presumably, that advertising and promotion did not include printed materials and did not cost much.

accuracy of the evidence.  In this case, applicant's survey evidence consisted <u>only</u> of 23 survey questionnaires completed by the survey respondents themselves.  Apparently, applicant and/or applicant's counsel distributed the survey questionnaires to an unknown number of people at motorsports events who filled them out at their leisure and subsequently mailed them back to applicant's counsel.  Suffice it to say that there is no basis on which to conclude that the survey is based on scientifically valid principles.  While we will not consider the "consumer surveys" as survey evidence, we will consider them as declarations purportedly asserting recognition of the proposed mark as a source indicator.

The people who submitted the 14 declarations that were identified as declarations were 14 of the 23 people who submitted the "consumer surveys."  Accordingly, we have 23 respondents, not 37 respondents.

However, not all of the survey respondents recognized the product configuration as pointing exclusively to a single source.

1.  Dwayne (only identification) did not recognize the product design at all; and,

2.  James L. Meigs, Miranda Osborn, John Schmid, Russell C. Roberts, Gary T. Bartz, and Paul

Krause identified the product design as emanating from multiple sources.

Applicant contends to the contrary that when the responses are viewed in their entirety they "unequivocally demonstrate **'Pit Bull'** is the first thing that comes to mind in terms of the source of the stand."[30] (Emphasis in the original).

We find the responses in the above-noted six survey responses to be ambiguous and, therefore, of limited probative value. The ambiguity of these "survey" questionnaires cast doubt on the credibility of the separate declarations submitted by Ms. Osborn and Messrs. Roberts and Bartz. Accordingly, we find that the declarations submitted by Ms. Osborn and Messrs. Roberts and Bartz have limited probative value.

Accordingly, there are 16 unambiguous "surveys"/declarations from people in the "Sportbike Motorcycle/Motorsports Industry" who recognize the proposed mark as pointing to a single source.[31] This evidence from 16 people familiar with motorcycle stands, while tending to show acquired distinctiveness as a trademark, must be

---

[30] Applicant's Reply Brief, p. 17.
[31] Even if we considered the six ambiguous declarations, as well as Dwayne's declaration, as evidence of acquired distinctiveness, it would not change our decision.

weighed against the nature of the subject matter sought to be registered. To put the matter simply, that 16 people in the entire "Sportbike Motorcycle/Motorsports Industry" through applicant's 16 years of doing business, have come to recognize applicant's product configuration as a trademark for motorcycle stands is not persuasive.[32]

Applicant asserts that because its motorcycle stand is the target of intentional copying, we may draw an inference that his product design has acquired distinctiveness.[33] However, we decline to draw such an inference because the proposed mark is a product design. Where the proposed mark is a product design, the copier may be attempting to exploit a desirable product feature, rather than seeking to confuse customers as to the source of the product. For example, applicant submitted two photographs, shown below, of products copying applicant's product design.[34]

---

[32] We note that throughout the prosecution of this application, applicant's counsel has made a continuing offer to provide additional "surveys" and declarations if required or necessary. However, "[t]he examining attorney should not specify the kind or the amount of evidence sufficient to establish that a mark has acquired distinctiveness. It is the responsibility of the applicant to submit evidence to establish that the mark has acquired distinctiveness." TMEP § 1212(g) (7th ed. 2010). Moreover, applicant has a responsibility to make sure that the record is complete prior to filing its notice of appeal. Trademark Rule 2.142(d).
[33] Applicant's Brief, pp. 21-22.
[34] Applicant's May 16, 2007 Response.

 

In both examples, the "copier" has identified its product with a word mark (*i.e.,* HEINDEL and POWER STANDS) that is different than applicant's PIT BULL word mark. *See Aromatique, Inc. v. Gold Seal,* 28 F.3d 863, 31 USPQ2d 1481, 1486 (8th Cir. 1994) (because defendant conspicuously used its own word mark, it made an attempt to distinguish its product. "[I]t was clearly erroneous to infer from [defendant's] copying of [plaintiff's] product that the mark at issue here [trade dress in packaging] had acquired secondary meaning"); *see also Cicena Ltd. v. Columbia Telecommunications Group*, 900 F.2d 1546, 14 USPQ2d 1401, 1406 (Fed.Cir. 1990) (defendant's product design was an effort to capitalize on a desirable product feature than to trade on any trademark rights acquired by plaintiff in that design).

Finally, in his Reply Brief, applicant points out that he is the owner of Registration No. 3356308 for the mark shown below for motorcycle stands.



"The mark consists of the color gold as used on the entire configuration of the motorcycle stand with the exception of the color red used on the handle and guards which is being claimed and the color black on the wheels which is not being claimed." The mark was registered on December 18, 2007. Applicant filed its notice of appeal on January 22, 2008. Applicant points out that in the application for the prior registration it submitted similar declarations and surveys to demonstrate that the red and gold color had acquired distinctiveness.

As indicated above in footnote No. 28, the record in an application should be complete prior to the filing of the notice of appeal. Accordingly, it is too late to reference evidence outside the record for the first time in a reply brief. Moreover, the mark in the registration

36

noted by applicant is for the colors gold and red, not for the configuration of the product.

In considering the totality of the probative evidence, we find that the evidence is insufficient to show that the design of applicant's motorcycle stand has acquired distinctiveness.

**Decision:** The refusal to register on the ground that the subject matter sought to be registered is functional is affirmed. The alternative refusal on the ground that the subject matter sought to be registered has not acquired distinctiveness under Section 2(f) is also affirmed.