NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**IN RE: REELEX PACKAGING SOLUTIONS, INC.,**
*Appellant*

---

2020-1282

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in Nos. 87285383, 87285412.

---

Decided: November 5, 2020

---

DAVID P. GORDON, Gordon & Jacobson P.C., Stamford, CT, for appellant. Also represented by CHRISTIAN MANNINO.

THOMAS L. CASAGRANDE, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA, for appellee Andrei Iancu. Also represented by CHRISTINA J. HIEBER, THOMAS W. KRAUSE, MEREDITH HOPE SCHOENFELD.

---

Before MOORE, O'MALLEY, and TARANTO, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

Reelex Packaging Solutions, Inc. ("Reelex") appeals from a final decision of the Trademark Trial and Appeal Board ("Board"), affirming the examining attorney's refusal to register two box designs for electric cables and wire on grounds that the designs are functional under Section 2(e)(5) of the Lanham Act, 15 U.S.C. § 1052(e)(5). *In re Reelex Packaging Solutions, Inc.*, Nos. 87285383, 87285412, 2019 BL 481341 (T.T.A.B. Oct. 23, 2019) (*Board Decision*).  Reelex also appeals the Board's determination that the designs have not acquired distinctiveness.  Because substantial evidence supports the Board's finding that the designs are functional, we *affirm*.

BACKGROUND

Reelex describes its "tangle-free technology" as "a patented method of winding a filamentary product (such as cord, wire, cable or tubing) into a figure-eight coil on a specialized coiling machine."  J.A. 229.  Reelex licenses patents and trademarks associated with this technology to wire and cable manufacturers.  Reelex explains that "[t]hose manufacturers use proprietary winding machines that are designed, manufactured, and patented by Reelex, and use Reelex knowhow to wind the cable and wire into finished coils of cable and wire."  Appellant Br. 10.  The finished coils are then packaged into a "Reelex Box."  According to Reelex, its "proprietary winding machines wind cable in a figure-eight pattern that allows the cable and wire to be dispensed or 'paid out' from the box without kinking and tangling."  *Id*. at 10–11.

In December 2016, Reelex filed two applications seeking to register the box designs shown below for coils of cables and wire in International Class 9.

 

Application Serial
No. 87285383
(the '383 trade dress)

Application Serial
No. 87285412
(the '412 trade dress)

The '383 trade dress includes the following description:

The mark consists of trade dress for a coil of cable or wire, the trade dress comprising a box having six sides, four sides being rectangular and two sides being substantially square, the substantially square sides both having a length of between 12 and 14 inches, the rectangular sides each having a length of between 12 and 14 inches and a width of between 7.5 and 9 inches and a ratio of width to length of between 60% and 70%, one, and only one rectangular side having a circular hole of between 0.75 and 1.00 inches in the exact middle of the side with a tube extending through the hole and through which the coil is dispensed from the package, the tube having an outer end extending beyond an outer surface of the rectangular side, and a collar extending around the outer end of the tube on the outer surface of the rectangular side of the package, and one square side having a line folding assembly bisecting the square side.

*Board Decision*, 2019 BL 481341, at *1–2. Reelex refers to the box in the '383 trade dress as the REELEX I box. As shown above, the '383 box includes a plastic "payout tube"

with a relatively smaller opening and a collar with a clip to hold the end of the wire. Reelex lists this box for use with smaller wire and cable, typically with coil diameters of 9–16 inches. *Id.* at *2.

The '412 trade dress includes the following description:

The mark consists of trade dress for a coil of cable or wire, the trade dress comprising a box having six sides, four sides being rectangular and two sides being substantially square, the substantially square sides both having a length of between 13 and 21 inches, the rectangular sides each having a length of the same length of the square sides and a width of between 57% and 72% of the size of the length, one, and only one rectangular side having a circular hole of 4.00 inches in the exact middle of the side with a tube extending in the hole and through which the coil is dispensed from the package, one square side having a tongue and a groove at an edge adjacent the rectangular side having the circular opening, and the rectangular side having the circular opening having a tongue and a groove with the tongue of each respective side extending into the groove of each respective side at a corner therebetween.

*Id.* Reelex refers to the box in the '412 trade dress as the REELEX II box. As shown above, the '412 box has a relatively larger payout opening and has a handle cut-out above the payout hole. Reelex lists this box for use with structured networking cable, coaxial cable, and other less-flexible wire or cable. *Id.*

The examining attorney refused registration, finding Reelex's trade dress functional and nondistinctive. The examining attorney further found that the designs do not function as trademarks to indicate the source of the goods identified in the applications. Reelex timely appealed the

final refusal to the Board, and the Board conducted an oral hearing in August 2019.[1]

On October 23, 2019, the Board issued the decision at issue on appeal, affirming the examining attorney's refusal to register on two grounds: functionality and distinctiveness.[2] As to functionality, the Board explained that "[c]ertain features of these boxes are clearly dictated by utilitarian concerns," including: (1) the "rectangular shape of the boxes . . . which is useful for shipping and storing;" and (2) the built-in handle in the '412 design, which makes it easier to lift and carry the box. *Id.* at *3. The Board further found that the "dimensions of the boxes and the size and placement of the payout tubes and payout holes are dictated by the amount and size of the electric wire and cable placed in the box." *Id.*

Next, the Board explained that Reelex's figure 8 winding system, shown below, has a coil that is unwound from its center, with the leading edge of the wire or cable threaded through a diamond-shaped opening.

---

[1]    Given the common issues of law and fact, the Board consolidated the appeals.

[2]    Because it affirmed on two independent grounds, the Board found it unnecessary to reach the refusal based on the third ground—that the designs do not function as marks to indicate the source of the goods identified. *Id.* at *17, n.64.



REELEX®          Knockoff

*Id.* at *4. Given this configuration, the Board found "that several features are useful in a box made for a figure 8 wound coil," including a payout hole to allow users to take advantage of the twist-free dispensing, and a payout tube "extending from the payout hole to the center of the coil . . . to maintain the radial opening in the coil and to maintain the coil in alignment with the payout hole." *Id.* The Board also found it useful to position the payout hole near the vertical center of the front panel "to provide easy access and a more direct path for dispensing the cable or wire." *Id.* The Board found these features sufficient to show that the box designs were "dictated by the utilitarian purpose they serve." *Id.* at *5.

Although the Board deemed this evidence sufficient to uphold the functionality refusal, it went on to consider the four factors from *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332 (CCPA 1982), in finding that the box designs are functional. Specifically, the Board found that the first factor—the existence of a utility patent disclosing the utilitarian advantages of the design sought to be registered— weighed in favor of finding the designs functional. Reelex had submitted five utility patents relating to the applied-for marks:

- U.S. Patent No. 5,810,272 for a Snap-On Tube and Locking Collar for Guiding Filamentary Material Through a Wall Panel of a Container Containing Wound Filamentary Material ("the '272 patent");

- U.S. Patent No. 6,086,012 for Combined Fiber Containers and Payout Tube and Plastic Payout Tubes ("the '012 patent");

- U.S. Patent No. 6,341,741 for Molded Fiber and Plastic Tubes ("the '741 patent");

- U.S. Patent No. 4,160,533 for a Container with Octagonal Insert and Corner Payout ("the '533 patent"); and

- U.S. Patent No. 7,156,334 for a Pay-Out Tube ("the '334 patent").

The Board found that the patents revealed several benefits of various features of the two boxes. Specifically, the Board found that many of the patents "bear directly" on the "tube extending through the hole" and "the tube having an outer end extending beyond an outer surface of the rectangular [front] side, and a collar extending around the outer end of the tube on the outer surface of the [front] rectangular side of the package," which are part of the '383 trade dress, and "with a tube extending in the hole," which is part of the '412 trade dress. *Id*. at *6.

For example, the '533 patent discloses that the payout tube should be aligned with the payout hole, and teaches the usefulness of a cutout handle opening to facilitate carrying and transporting the box. *Id*. The '272 patent likewise discloses a payout tube aligned with the hole in the box, and further teaches a "payout tube and locking collar which can be snap-fastened together on opposite sides of the wall of a container, remain in a permanent locked position and provide a smooth radius between the edge of the payout tube and the locking collar" to prevent damage to the wire or cable when it is withdrawn from the container through the payout tube. '272 patent, col. 2, ll. 13–19.

The '012 patent describes the REELEX II package, and discloses information about the purpose and advantage of the box design. Specifically, the payout tubes described in

the '012 patent feature "oversized" openings to facilitate "kinkless unwinding from the inner coil to the outer coil" of certain types of cables. '012 patent, col. 1, ll. 24–29. The '012 patent explains that the box "is dimensioned in accordance with the diameter of the wound coil that is to be contained therein and may be manufactured in standard sizes to accommodate standard diameters of wound coils." *Id.* at col. 5, ll. 7–10. As an example, the patent provides that "the container 60 shown in Fig. 10A may be 9.5 inches x 13.5 inches to accommodate a 12 inch diameter coil." *Id.* at col. 5, ll. 10–12. The '012 patent further discloses a cut-out for a "hand hold" that "enables container 60 to be carried from site to site." *Id.* at col. 5, ll. 2–3.

The '741 patent teaches the advantages of larger payout holes, like those in the '412 trade dress application. It explains that certain types of cables have "inherent residual twist characteristics" that "require a much larger payout hole and payout tube to avoid kinking and interference with payout of the cable when would in a Fig. 8 configuration." '741 patent, col. 2, ll. 8–12.

And the '334 patent, which relates to a payout tube used within a cable container for directing cable from the container, notes that figure 8 coils are "customary in the manufacturing and preparation for shipment and subsequent handling of cable." '334 patent, col. 1, ll. 12–13. It teaches that, '[t]o facilitate storage, shipping, and handling, such windings are typically housed within a cardboard or similar container which has an opening formed in one wall." *Id.* at col. 1, ll. 22–24. The opening receives a perpendicular pay-out tube extending through the coil to allow dispensing of the wire. *Id.* at col. 1, ll. 31–45. These pay-out tubes "are commonly used in the cable industry" and "function[] as a guide that facilitates the uncoiling of the cable loops so that the cable may be dispensed in a fashion ready for application." *Id.* at col. 1, ll. 42–46.

The Board found that the disclosures and preferred embodiments in the patents revealed the functionality of significant aspects of the claimed designs. In particular, the Board found that "the specific size of the boxes and size and location of the payout holes is dictated by their function to house and dispense electric wire and cable of specific sizes." *Board Decision*, 2019 BL 481341, at *9.

Next, the Board found that the second *Morton-Norwich* factor—advertising by the applicant that touts the utilitarian advantages of the designs—also weighed in favor of a functionality finding. For example, Reelex's advertising materials repeatedly tout that its figure 8 winding and packaging system provides better dispensing of cable or wire by preventing kinking or tangling. *Id.* The Board also found that Reelex's advertising touts the recyclability, stacking, shipping, and storage advantages of the claimed boxes. *Id.*

Turning to the third *Morton-Norwich* factor, regarding the availability of alternative deigns, the Board explained that, where, as here, patents and advertising demonstrate that the designs are functional, there is no need to consider alternative designs. *Id.* at *10. The Board nevertheless considered Reelex's evidence regarding alleged alternative designs, which consisted of a declaration from Frank Kotzur, a long-time employee of Reelex. The Board ultimately found Reelex's evidence lacking, primarily because the declaration was speculative and contained conclusory statements that were contradicted by Reelex's own advertising and patents.

Finally, as to the fourth *Morton-Norwich* factor—assessing whether the designs resulted from a comparatively simple or inexpensive method of manufacture—the Board found no evidence of record regarding the cost or complexity of manufacturing the claimed trade dress. *Id.* at *12.

On this record, the Board found that the overall design of Reelex's trade dress is "essential to the use or purpose of

the device" as used for "electric cable and wires." *Id.* As such, the Board affirmed the refusal to register on functionality grounds. The Board also found, as an independent ground for denying registration, that Reelex failed to prove that the box designs had acquired distinctiveness under Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f).

Reelex timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(B).

DISCUSSION

We review the Board's legal determinations de novo and its factual findings for substantial evidence. *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003). Functionality is a question of fact. *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1273 (Fed. Cir. 2002). Accordingly, we must uphold the Board's functionality finding unless it is unsupported by substantial evidence. *Id.* Substantial evidence requires "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.*

On appeal, Reelex argues that the Board erred in its functionality analysis "because the totality of record evidence shows that the trade dresses at issue provide no real utilitarian advantage to the user." Appellant Br. 18. Reelex also argues that the Board erred in failing to consider competent evidence of alternative designs in rendering its functionality decision.[3] Neither argument has merit.

---

[3] As noted, Reelex also challenges the Board's distinctiveness analysis. Because substantial evidence supports the Board's functionality determination, we need not reach acquired distinctiveness. Reelex further challenges

First, we find no error in the Board's functionality analysis. The Lanham Act precludes registration of an alleged mark that "comprises any matter that, as a whole, is functional."  15 U.S.C. § 1052(e)(5).  A feature is "functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33 (2001).

The Supreme Court has explained that "[t]he functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995).  A mark is not registrable if the design described is functional, because "[i]t is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time." *Id.*

"To support a functionality rejection in proceedings before the Board, the PTO examining attorney must make a prima facie case of functionality, which if established must be rebutted by 'competent evidence.'" *In re Becton, Dickinson & Co.*, 675 F.3d 1368, 1374 (Fed. Cir. 2012) (quoting *In re Teledyne Indus., Inc.*, 696 F.2d 968, 971 (Fed. Cir. 1982)). The relevant inquiry is whether the designs sought to be registered, each taken as a whole, are functional.  *Id.* (consideration of whether "an overall design is functional should be based on the superiority of the design as a whole, rather than on whether each design feature is 'useful' or

the examining attorney's finding that the marks fail to function as an indication of source.  The Board declined to address this issue, finding it unnecessary to do so.  We agree.

'serves a utilitarian purpose.'" (quoting *Textron, Inc. v. Int'l Trade Comm'n*, 753 F.2d 1019, 1026 (Fed. Cir. 1985)).

To determine whether a particular design is functional, the Board considers the *Morton-Norwich* factors: (1) the existence of a utility patent that discloses the utilitarian advantages of the design sought to be registered; (2) advertising by the applicant that touts the utilitarian advantages of the design; (3) facts pertaining to the availability of alternative designs; and (4) facts indicating that the design results from a comparatively simple or inexpensive method of manufacture. *Valu Eng'g*, 278 F.3d at 1274 (citing *Morton-Norwich*, 671 F.2d at 1340–41).

Here, the Board identified multiple useful features present in the '383 and '412 boxes that combine to define box designs "dictated by the utilitarian purpose they serve." *Board Decision*, 2019 BL 481341, at \*5. These features include, among other things: (1) the rectangular shape of the boxes, which allows for stacking and makes for easier shipping and storing; (2) the built-in handle in the '412 application, which makes it easier to lift and carry the box; (3) the dimensions of the boxes and the size and placement of the payout tubes and payout holes, which are "dictated by the amount and size of the electric wire and cable placed in the box;" (4) the payout hole positioned near the center of the front panel and the payout tube extending from the payout hole, which aid in twist-free dispensing from the figure 8 coil; and (5) the panel shape and size dictated by the shape of the figure 8 wound coil of cable or wire. *Id.* at \*4–5. The Board found that these "combined features" are "essential to the use or purpose of the article or affect[] the cost or quality of the article." *Id.* at \*5 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)). As such, although Reelex argues that the Board improperly dissected the designs of the two trade dresses into discrete design features, review of the Board's decision reveals that it analyzed the features as a whole and in combination.

The Board then analyzed the four *Morton-Norwich* factors, and found that they, too, weighed in favor of a functionality finding.  With respect to the first factor—the existence of a utility patent disclosing the utilitarian advantages of the design—the  Board engaged in a detailed analysis of the patents Reelex submitted, and found that they demonstrate the functionality of significant aspects of the box designs.  As set forth above, the Board discussed the disclosures and preferred embodiments in the patents, which reveal that these boxes are designed to protect the figure 8-wound coils and to allow for kinkless and tangle-free unwinding of cable through the payout tube.  The Board explained that "the specific size of the boxes and size and location of the payout holes is dictated by their function to house and dispense electric wire and cable of specific sizes." *Board Decision*, 2019 BL 481341, at \*9.  Likewise, the Board found that "[t]he size and nature of the cable dictates the size of the hole, the size of the coil dictates the dimensions of the box, including the fact that it is square on two sides and rectangular on other panels." *Id.*  Substantial evidence supports the Board's analysis with respect to the first *Morton-Norwich* factor.

Turning to the second *Morton-Norwich* factor, the Board found that statements in Reelex's advertising  materials tout the utilitarian advantages of the box designs. For example, the Board looked to Reelex's website, which alleges that its figure 8 winding and packaging system provides better dispensing of the cable or wire.  *Id.*  Reelex repeatedly touts that these box designs make payout easier and faster, without kinking or tangling, and that they are lower cost, easier to stack and transport, less prone to damage, and are recyclable.

Reelex argues that the Board erred in its assessment of the advertising evidence because certain of the alleged utilitarian advantages—namely recyclability, stackability, and ease of shipping and storage—"apply to almost any cardboard box." Appellant Br. 48.  But the Board's analysis

was not so limited. Instead, the Board identified numerous statements promoting the utilitarian advantages of the boxes, including specific statements touting the benefits of the payout tube in the designs, which prevent kinks and twists in the cable. We therefore find substantial evidence supporting the Board's assessment of Reelex's advertising.

Reelex's primary argument on appeal is that the Board's *Morton-Norwich* analysis was flawed because it ignored "competent evidence of alternative designs." Appellant Br. 45. As the Board correctly noted, however, if functionality is found based on other considerations, "there is 'no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available.'" *Becton*, 675 F.3d at 1376 (quoting *Valu Eng'g*, 278 F.3d at 1276); *see also In re Bose Corp.*, 772 F.2d 866, 872 (Fed. Cir. 1985) ("That another type of enclosure would work equally as well does not negate that this enclosure was designed *functionally* to enhance or at least not detract from the rest of the system."). "But that does not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place." *Valu Eng'g*, 278 F.3d at 1276.

Here, despite Reelex's suggestion otherwise, the Board expressly considered Reelex's evidence of alternative designs, which consisted of a declaration from Frank Kotzur, a long-time employee of Reelex and named inventor on several of the patents Reelex identified as related to these designs. *Board Decision*, 2019 BL 481341, at *10–11. The Board declined to "give much weight" to Kotzur's declaration, finding that he provided "no evidence to support his speculation," and that several of his assertions were contradicted by other evidence. *Id*. at *10. For example, although Kotzur alleged that any box "large enough to house the coil" would work, Reelex's own packaging guidelines state that the box should fit the coil "snugly." *Id*. at *11.

And, although Kotzur stated that the shape of the package, as well as the shape, size, and location of the payout hole, were merely ornamental, the Board explained that the utility patents repeatedly refer to the utilitarian advantages of the two box designs.[4]

Accordingly, although Reelex contends that the Board "ignored" Kotzur's declaration, it is clear that the Board explicitly addressed it. The Board is entitled to assess credibility and has broad discretion to weigh the evidence presented. *Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.*, 906 F.3d 965, 979–80 (Fed. Cir. 2018) ("The TTAB is entitled to weigh the evidence."); *see also Inwood Labs.*, 456 U.S. at 856 ("Determining the weight and credibility of the evidence is the special province of the trier of fact."). We find no error in the Board's consideration of alternative designs, and we decline Reelex's request to reweigh the evidence on appeal. Nor do we find any error in the Board's conclusion that the boxes at issue are "simple, basic boxes that provide numerous utilitarian advantages for figure 8 or otherwise wound coils of cable and wire designed for dispensing from the center of the coil. That means the boxes are functional, and [Reelex's] competitors need not look for other possible alternative designs." *Board Decision*, 2019 BL 481341, at *11.

---

[4]    The Board acknowledged that third parties sometimes use spools of wire rather than figure 8 wound coils. And they sometimes use shrink-wrap or hard plastic packaging. But the Board noted that those alternatives "are different options with a different set of advantages and disadvantages," and that "only similar boxes designed for use with figure 8 wound or otherwise reel less coils are relevant alternatives to the claimed trade dress." *Board Decision*, 2019 BL 481341, at *11.

On this record, we find substantial evidence supporting the Board's factual determination that the '383 and '412 box designs, each taken as a whole, are functional.

## CONCLUSION

We have considered Reelex's remaining arguments regarding functionality and find them unpersuasive. Because we find no legal error in the Board's functionality analysis, and because substantial evidence supports the Board's findings that Reelex's box designs are functional, we *affirm* the Board's final decision refusing registration.

## **AFFIRMED**